**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CASE NO. 8:25-cv-02920-KKM-NHA**

STEVE LEVINE and JAQUELYN DEPPE,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.
MUNICIPAL PARKING SERVICES, INC.,
PREMIUM PARKING SERVICE, LLC, and
GOVCIO, LLC,

Defendants.
_______________________________________/

# AMENDED CLASS ACTION COMPLAINT

Plaintiffs Steve Levine ("Plaintiff Levine") and Jaquelyn Deppe ("Plaintiff Deppe"), individually and on behalf of all others similarly situated, bring this class action against Municipal Parking Services, Inc., ("MPS"), Premium Parking Service, LLC ("Premium"), and GovCIO, LLC ("GovCIO") (together, "Defendants"), and allege as follows:

## PRELIMINARY STATEMENT

1. This is a privacy case under the Driver's Privacy Protection Act. Plaintiffs are not suing to avoid a parking payment. The issue is how Defendants got their name and/or home address. Defendants used Plaintiffs' license plate numbers to obtain that information from a protected motor vehicle record, then used it to send them private payment demands.

2. Plaintiff Levine is a resident of Pinellas Park, Florida. On October 7, 2025, his daughter parked his vehicle at a private parking lot in Redington Shores, Florida. Days later, he received a private "Parking Invoice" from Premium and MPS, companies he had never dealt with before. The invoice was mailed to Plaintiff Levine's home address. It threatened that his vehicle could be booted or towed if payment was not received.

3. Plaintiff Deppe is a resident of Pinellas County, Florida. On April 26, 2025, she drove her vehicle through the same private parking lot in Redington Shores, Florida twice—once to drop off family members and once to pick them up. She never parked in a parking space. Days later, Premium and MPS mailed her a private "Parking Invoice," falsely claiming her vehicle had been parked for nearly four hours. The notice also threatened booting or towing if payment was not received.

4. Before Defendants obtained Plaintiffs' personal information and mailed the invoices, Plaintiffs had not given Defendants their names. They had not given Defendants their home addresses. They had not signed a written consent, created an account, or provided personal information for private parking enforcement. Defendants could not identify them and/or reach them at home from the license plate capture alone. They did so by using their license plate numbers to obtain their names and/or home addresses from a state motor vehicle record.

5. Congress enacted the Driver's Privacy Protection Act to protect personal information held in state motor vehicle records. The DPPA prohibits any person from

knowingly obtaining, disclosing, or using that information for a purpose Congress did not permit. Private parking invoicing is not among the permitted uses Congress listed.

6. Defendants' system is standardized. A camera reads a plate. The plate is used to obtain a registered owner's name and home address from motor vehicle records. A private payment demand is mailed to the owner's home. The notice threatens collections, booting, and towing. Defendants built this workflow around access to DMV-sourced personal information. Without that information, Defendants cannot identify the owner, locate the owner's home address, or send the invoice.

7. Defendants' system is not limited to Plaintiffs. It is a standardized workflow used to convert license plate captures into names and home addresses, then use that information to send private parking invoices. Plaintiffs bring this case for themselves and others whose protected motor vehicle information was obtained, used, or disclosed through that same system.

## PARTIES

8. Plaintiff Levine is a natural person and a citizen and resident of the State of Florida. Plaintiff Levine resides in Pinellas County, Florida, in the Middle District of Florida. At all relevant times, Plaintiff Levine was the registered owner of the vehicle bearing Florida license plate AW17LH.

9. Plaintiff Deppe is a natural person and a citizen and resident of the State of Florida. Plaintiff Deppe resides in Pinellas County, Florida, in the Middle District of Florida. At all relevant times, Plaintiff Deppe was the registered owner of the vehicle bearing Georgia license plate CRV9063.

10. Defendant MPS is a corporation organized under the laws of Minnesota with its principal place of business in Austin, Texas. MPS is a "person" within the meaning of 18 U.S.C. § 2725(2). MPS operates private parking enforcement programs at parking facilities throughout Florida and other states.

11. Defendant Premium is a limited liability company organized under the laws of Delaware with its principal place of business in New Orleans, Louisiana. Upon information and belief, each of the members of Premium are citizens of Louisiana. Premium is a "person" within the meaning of 18 U.S.C. § 2725(2). Premium operates private parking enforcement programs at parking facilities throughout Florida and other states.

12. Defendant GovCIO is a limited liability company organized under the laws of Delaware with its principal place of business in Fairfax, Virginia. Upon information and belief, each of the members of GovCIO, LLC are citizens of Virginia. GovCIO is a "person" within the meaning of 18 U.S.C. § 2725(2). Upon information and belief, GovCIO provides or supports parking enforcement technology services for private parking operators, including Premium and MPS. Upon information and belief, those services were used at parking facilities in this District, including the parking facility at issue in this case.

## JURISDICTION AND VENUE

13. This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721 through 2725.

14. This Court has personal jurisdiction over MPS because MPS conducts business in Florida, is registered to do business in Florida, and directed the conduct at issue in this action toward Plaintiffs in this District. MPS attempted to enforce an alleged private parking charge arising from a parking facility in Redington Shores, Florida; obtained or caused the obtainment of Plaintiffs' DMV-sourced personal information; mailed or caused a private parking notice to be mailed to Plaintiff Levine's home address in Pinellas County, Florida.

15. This Court has personal jurisdiction over Premium because Premium conducts business in Florida, is registered to do business in Florida, and directed the conduct at issue in this action toward Plaintiffs in this District. Premium attempted to enforce an alleged private parking charge arising from a parking facility in Redington Shores, Florida; obtained or caused the obtainment of Plaintiffs' DMV-sourced personal information; mailed or caused a private parking notice to be mailed to Plaintiff Levine's home address in Pinellas County, Florida.

16. This Court has personal jurisdiction over GovCIO because GovCIO is registered to do business in Florida, and GovCIO provides parking enforcement services to private parking operators at facilities located in Florida, including facilities operated or enforced by Premium and MPS. Upon information and belief, GovCIO provided or supported the technology platform used in Premium and MPS's private parking enforcement workflow, including the workflow used for Plaintiffs' Parking Invoice. Through that platform, and upon information and belief, GovCIO processed or supported the registered-owner lookup, data transmission, notice generation, or

mailing workflow for the Parking Invoices, which concerned a parking facility in this District and which included a Parking Invoice being mailed to Plaintiff Levine's home in this District.

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District. The parking facility at issue is located in Redington Shores, Florida. Plaintiffs reside in Pinellas County, Florida. Defendants obtained, used, or disclosed Plaintiff Levine's DMV-sourced personal information to identify him and mail a private parking notice to his home address in this District.

## THE DRIVER'S PRIVACY PROTECTION ACT

18. The Driver's Privacy Protection Act, 18 U.S.C. §§ 2721 through 2725, protects personal information contained in motor vehicle records. The DPPA makes it unlawful for any person knowingly to obtain or disclose personal information from a motor vehicle record for any use not permitted by the statute. 18 U.S.C. § 2722(a).

19. The DPPA also imposes civil liability on any person who knowingly obtains, discloses, or uses personal information from a motor vehicle record for a purpose not permitted by the statute. 18 U.S.C. § 2724(a).

20. "Personal information" under the DPPA means information that identifies an individual, including the individual's name and address. 18 U.S.C. § 2725(3).

21. A "motor vehicle record" means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles. 18 U.S.C. § 2725(1).

22. The DPPA defines "express consent" to mean consent in writing, including consent conveyed electronically that bears an electronic signature. 18 U.S.C. § 2725(5).

23. The DPPA provides a limited set of permissible uses of personal information from motor vehicle records. Those permissible uses are enumerated in 18 U.S.C. § 2721(b).

24. A person who violates the DPPA is liable to the individual to whom the information pertains. The remedies Plaintiffs seek here include actual damages, but not less than liquidated damages in the amount of $2,500, punitive damages for willful or reckless disregard of the law, and reasonable attorneys' fees and costs. 18 U.S.C. § 2724(b).

## FACTUAL ALLEGATIONS

### A. Premium's and MPS's private parking enforcement model

25. Premium monitors and enforces parking at private parking facilities in Florida and other states. These facilities are privately owned. They are not operated by any municipal, county, or state government.

26. Premium, in conjunction with MPS, uses automated license plate recognition ("ALPR") cameras and related technology to capture and record license plate numbers as vehicles enter and exit private parking lots. MPS provides the ALPR

cameras, enforcement software, and related technology used at Premium-managed facilities. MPS licenses or sells its proprietary ALPR technology and software to Premium, which allows Premium to monitor its parking lots via cameras without any physical barriers or attendants.

27. To identify the registered owner of a vehicle and locate the owner's home address, Premium and MPS must obtain that personal information from another source. Upon information and belief, that source is a state motor vehicle record, or a vendor, database, or other motor-vehicle-record-derived source that obtains registered-owner information from state motor vehicle records.

28. When Premium's and MPS's systems flag a vehicle for an alleged unpaid or underpaid private parking charge, neither Premium nor MPS knows the registered owner's name or home address from the license plate alone. Nor do Premium or MPS require drivers to provide their names, home addresses, or other registered-owner information at entry, at exit, or through an on-site attendant.

29. Upon information and belief, Premium and MPS request, retrieve, or cause the retrieval of registered-owner information from motor vehicle records after a captured license plate has been flagged for an alleged private parking charge. In Plaintiffs' case, the lookup occurred after the vehicles had departed the parking facility, as part of an after-the-fact invoicing process.

30. A license plate identifies a vehicle. It does not, by itself, identify the person who parked the vehicle, the person who drove it, or the registered owner's home address. Defendants' post-departure workflow nevertheless uses the captured

plate number to identify the registered owner, obtain the owner's home address from motor vehicle records, and send a private payment demand to that address.

31. Premium and MPS then mail a "Parking Invoice" to the registered owner's home address. Some of these invoices are printed on Premium letterhead, while others are printed on MPS letterhead. The invoice demands payment online via Premium's website or via check mailed to MPS and threatens that "IF PAYMENT IS NOT RECEIVED BY FINAL DUE DATE, VEHICLE IS SUBJECT TO BOOTING/TOWING."

32. The invoice states on its face that it is "privately issued, is not issued by a governmental authority, and is not subject to civil or criminal penalties."

33. Premium and MPS were not required to obtain DMV-sourced personal information to operate a private parking facility or collect payment for parking. Private parking operators can require payment at entry, at exit, at an on-site kiosk, through an app or website where the driver voluntarily provides information, or through on-site notices that do not require a post-departure motor vehicle record lookup. Premium and MPS instead used a post-departure workflow that converted license plate captures into registered-owner names and home addresses.

34. Upon information and belief, Premium and MPS do not file civil actions or arbitrations to collect private parking charges of this type. In fact, Premium's and MPS's invoices expressly state they are "not subject to civil . . . penalties." Premium's and MPS's notice-based enforcement workflow relies on mailed invoices, threatened collections, and threatened booting or towing.

35. Upon information and belief, Premium and MPS each receive a share of the revenue derived from any payments received from parking invoices.

**B. <u>GovCIO's role in the enforcement workflow</u>**

36. Upon information and belief, GovCIO provides or supports the registered-owner lookup function used in connection with Premium's and MPS's private parking enforcement workflow. GovCIO publicly advertises on its website that "Customers can use our enterprise server to connect city and private parking providers with DMV and public data sources." Upon information and belief, GovCIO's services include DMV data-retrieval functionality, registered-owner lookup services, data infrastructure, and related systems used to convert captured license plate numbers into vehicle owners' names and home addresses for use in enforcing private parking charges.

37. Upon information and belief, MPS contracts with GovCIO to obtain registered-owner names and home addresses from motor vehicle records. Upon information and belief, MPS sends captured license plate information to GovCIO, and GovCIO requests, receives, processes, and stores personal information from motor vehicle records, including registered-owner names and home addresses tied to captured license plate numbers, as part of the enforcement workflow it provides, operates, or supports for Premium. The details of GovCIO's data-retrieval processes, DMV access agreements, data-storage architecture, data-sharing arrangements, and allocation of functions are within Defendants' knowledge and control.

38. Upon information and belief, GovCIO transmits DMV-sourced personal information to MPS and Premium and to mailing vendors to facilitate the generation and mailing of private parking notices. Upon information and belief, GovCIO also transmits or makes DMV-sourced personal information available to downstream vendors, including collection vendors, when notices remain unpaid or when additional enforcement activity is pursued.

### C. Plaintiffs' parking invoices

***Plaintiff Levine***

39. On or about October 7, 2025, Plaintiff Levine's daughter drove and parked Plaintiff Levine's vehicle at a Premium parking lot equipped with ALPR technology provided by MPS located at 17490 Gulf Blvd., Redington Shores, Florida. Upon information and belief, the facility was monitored by Premium using LPR-based enforcement technology provided, operated, or supported by MPS.

40. Premium's and MPS's systems at that lot purported to capture the vehicle's license plate and recorded entry and exit times.

41. Before Defendants obtained his personal information and mailed the Parking Invoice, Plaintiff Levine had not provided his name, home address, or other personal information to Premium, MPS, GovCIO, or any agent or vendor acting on their behalf. Plaintiff had no prior relationship with Premium, MPS, or GovCIO.

42. Plaintiff Levine did not sign any written consent form or execute any electronic agreement authorizing Premium, MPS, GovCIO, or any other party to obtain his personal information from a motor vehicle record. Plaintiff Levine did not

see any signage at the parking facility disclosing that Defendants would obtain his name and home address from state motor vehicle records, as he was not even in the vehicle his daughter was driving on October 7, 2025. In any event, posted signage is not "express consent" under 18 U.S.C. § 2725(5), which requires consent in writing or electronic consent bearing an electronic signature.

43. On or about October 8, 2025, Premium and MPS mailed a "Parking Invoice" to Plaintiff Levine's home address in Pinellas Park, Florida. The notice identified the license plate number, the parking lot location, and the entry and exit times.

44. The notice stated an "Amount Due" of $75.00, and an increased amount due of $115.00 if not paid by November 7, 2025. The Parking Invoice demanded online payment on Premium's website or by check sent by mail to MPS.

45. The invoice stated in capitalized text:

> "IF PAYMENT IS NOT RECEIVED BY FINAL DUE DATE, VEHICLE IS SUBJECT TO BOOTING/TOWING."

46. Defendants could not have identified Plaintiff Levine by name or located his home address from the license plate capture alone. Upon information and belief, Defendants identified Plaintiff and located his home address by using the captured license plate number to obtain personal information from a motor vehicle record maintained by the Florida Department of Highway Safety and Motor Vehicles, another state motor vehicle agency, or a vendor or data source that obtains registered-owner information from motor vehicle records.

47. After receiving the notice, Plaintiff Levine reviewed the mailing. He had to determine who Premium and MPS were, why Premium and MPS had his personal information, and how Premium and MPS had obtained his home address. He also had to evaluate the stated threats of booting or towing and decide how to respond.

***Plaintiff Deppe***

48. On or about April 26, 2025, Plaintiff Deppe drove her vehicle through the same Premium parking lot located at 17490 Gulf Blvd., Redington Shores, Florida. Plaintiff Deppe entered the lot only to drop off family members and their beach items at the nearby beach. After doing so, Plaintiff Deppe immediately drove the vehicle back to her home (which is within walking distance of the lot), parked it in her own garage, and walked to the beach to meet her family members. Later that day, Plaintiff Deppe walked back to her home, retrieved her vehicle, and drove back through the parking lot only to pick up her family members and their belongings. At no point did Plaintiff Deppe park the vehicle in a parking space or otherwise use the lot for parking.

49. Upon information and belief, the facility was monitored by Premium using ALPR-based enforcement technology provided, operated, or supported by MPS.

50. Premium's and MPS's systems at that lot purported to capture the vehicle's license plate and recorded entry and exit times.

51. Before Defendants obtained her personal information and mailed the Parking Invoice, Plaintiff Deppe had not provided her name, home address, or other personal information to Premium, MPS, GovCIO, or any agent or vendor acting on

their behalf. Plaintiff Deppe had no prior relationship with Premium, MPS, or GovCIO.

52. Plaintiff Deppe did not sign any written consent form or execute any electronic agreement authorizing Premium, MPS, GovCIO, or any other party to obtain her personal information from a motor vehicle record. Plaintiff Deppe did not see any signage at the parking facility disclosing that Defendants would obtain her personal information from state motor vehicle records. In any event, posted signage is not "express consent" under 18 U.S.C. § 2725(5), which requires consent in writing or electronic consent bearing an electronic signature.

53. On or about April 28, 2025, Premium mailed a "Parking Invoice" to Plaintiff Deppe, addressed to Plaintiff Deppe by name. The Parking Invoice identified the license plate number, the parking lot location, and the entry and exit times. Specifically, the Parking Invoice stated that Plaintiff Deppe's vehicle had been parked for approximately three hours and fifty-eight minutes. That statement was false. Plaintiff Deppe never parked at the lot. She merely drove through the lot twice, once to drop off her family members and their belongings and once to pick them up later that day.

54. The "Parking Invoice" stated an "Amount Due" of $75.00, and an increased amount due of $115.00 if not paid by May 27, 2025. The Parking Invoice demanded online payment on Premium's website or by check sent by mail to MPS.

55. The invoice stated in capitalized text:

> "IF PAYMENT IS NOT RECEIVED BY FINAL DUE DATE, VEHICLE IS SUBJECT TO BOOTING/TOWING."

56. Defendants could not have identified Plaintiff Deppe by name or located her address from the license plate capture alone. Upon information and belief, Defendants identified Plaintiff Deppe by using the captured license plate number to obtain personal information from a motor vehicle record maintained by the Georgia Department of Driver Services, another state motor vehicle agency, or a vendor or data source that obtains registered-owner information from motor vehicle records.

57. After receiving the notice, Plaintiff Deppe reviewed the mailing. She had to determine who Premium and MPS were, why Premium and MPS had her personal information, and how Premium and MPS obtained her personal information. She also had to evaluate the stated threats of booting or towing and decide how to respond, given that Plaintiff Deppe did not even park in the Redington Shores parking lot. Plaintiff Deppe further contacted local news media to report Defendants' practices, and a reporter from a local news channel in Tampa, Florida subsequently interviewed Plaintiff Deppe and published a news report concerning Plaintiff Deppe's experience and Premium and MPS's parking-enforcement practices.

### D. <u>The unlawful obtainment of DMV-sourced personal information</u>

58. The DPPA prohibits any person from knowingly obtaining personal information from a motor vehicle record for a purpose not permitted by the statute. 18 U.S.C. § 2724(a).

59. Using the captured license plate number, Defendants knowingly obtained, or caused to be obtained, Plaintiffs' personal information, including Plaintiff Levine's name and home address and Plaintiff Deppe's name, from a motor vehicle record. Defendants obtained that information directly from a motor vehicle record or through a vendor, database, or data source that obtains registered-owner information from motor vehicle records. Defendants obtained that information before mailing the Parking Invoice to Plaintiffs.

60. The obtainment was not accidental. Defendants designed, operated, provided, supported, or used a standardized system that converts captured license plate numbers into registered-owner names and home addresses by querying motor vehicle records or by using vendors, databases, or data sources that obtain registered-owner information from motor vehicle records.

61. Defendants obtained Plaintiffs' personal information for the purpose of generating and mailing a private payment demand. That purpose is not permitted under 18 U.S.C. § 2721(b).

62. Plaintiffs did not authorize Defendants to obtain their personal information from any motor vehicle record. Before Defendants obtained their personal information and mailed the invoice, Plaintiffs did not provide "express consent" within the meaning of 18 U.S.C. § 2725(5). They did not sign any written consent form, execute any electronic consent bearing an electronic signature, or agree to any terms authorizing Defendants or their agents, vendors, or service providers to obtain, use, or disclose their DMV-sourced personal information.

63. Any terms or conditions presented after Defendants obtained Plaintiffs' DMV-sourced personal information could not retroactively authorize Defendants' prior obtainment, use, or disclosure of that information.

**E. <u>The use and disclosure of DMV-sourced personal information</u>**

64. After obtaining Plaintiffs' personal information from a motor vehicle record, Defendants used and disclosed that information to generate a private parking invoice and mail that notice to Plaintiffs.

65. Premium and MPS used Plaintiffs' DMV-sourced personal information by storing it in enforcement records, matching it to the captured license plate number, creating an enforcement account, generating a mailed demand, sending or causing that demand to be sent to Plaintiffs, including to Plaintiff Levine's home, and processing payment in response to the demand.

66. GovCIO used Plaintiffs' DMV-sourced personal information by storing or processing it within their enforcement platform or systems, matching it to the captured license plate number, supporting notice generation, and transmitting information needed to generate and mail the Parking Invoice.

67. Defendants disclosed Plaintiffs' DMV-sourced personal information by transmitting it among MPS, Premium, and GovCIO, and one or more mailing vendors to generate, print, or mail the Parking Invoice.

68. Upon information and belief, Defendants' regular enforcement workflow involves additional disclosure of DMV-sourced personal information to collection vendors for unpaid accounts and to vendors or agents involved in threatened booting

or towing activity. The details of Defendants' data-sharing arrangements with mailing vendors, payment vendors, collection vendors, booting vendors, towing vendors, and other downstream recipients are within Defendants' knowledge and control.

69. The mailing Plaintiffs received was not a traffic citation. It was not issued by any government. It was not filed with any court or processed by any governmental agency. It was a private invoice from private companies, generated using personal information obtained from a protected motor vehicle record, and delivered to an address, including Plaintiff Levine's home address, that Defendants could not have obtained from the license plate capture alone.

**F. Why no DPPA permissible use applies**

70. The DPPA provides a limited list of permissible uses of personal information from motor vehicle records. 18 U.S.C. § 2721(b). Defendants obtained, used, and disclosed Plaintiffs' DMV-sourced personal information to identify the registered owner of a vehicle, locate that person's home address, generate and mail a private parking charge notice, and collect or attempt to collect a private parking charge. That purpose is not permitted under § 2721(b).

71. Defendants' conduct was not permitted under § 2721(b)(3). Plaintiffs did not provide Defendants with their name, home address, or other personal information for Defendants to verify, correct, or supplement. Defendants did not use motor vehicle records to verify information Plaintiffs supplied to them. They used Plaintiffs' license plate number to identify them in the first instance, obtain their home address, and send a private payment demand.

72. Defendants' conduct was not for use in connection with the operation of private toll transportation facilities under § 2721(b)(10). The parking facility at 17490 Gulf Blvd. is a privately owned parking lot. It is not a toll road, bridge, tunnel, or transportation facility. A parking lot is where travel ends. It is not a facility through which travelers pass and pay for the act of transit. Congress has included "parking facilities" in other federal transportation statutes when it intended to address parking facilities, but it did not include parking facilities in § 2721(b)(10).

73. Defendants also did not retrieve Plaintiffs' personal information during the operation of a toll transportation facility or while Plaintiffs' vehicle was present at the parking facility. Upon information and belief, the DMV lookup occurred only after the vehicles departed, as part of a post-departure invoicing process. That process was separate from the operation of any private toll transportation facility.

74. Defendants' conduct was not for use in connection with any civil, criminal, administrative, or arbitral proceeding, or any investigation in anticipation of litigation, under § 2721(b)(4). The Parking Invoice did not threaten litigation. It threatened booting and towing. The Parking Invoice identified itself as an "invoice," not as an investigation or preparation for any legal proceeding. In fact, the Parking Invoice expressly states that the "INVOICE . . . IS NOT SUBJECT TO CIVIL . . . PENALTIES."

75. Upon information and belief, Defendants do not file civil actions or arbitrations to collect private parking charges of this type as part of this workflow. Defendants' DMV-data workflow is standardized and automated. It is triggered when

their system flags a vehicle for an alleged private parking charge, not when an attorney, legal department, or other decision-maker determines that a lawsuit, arbitration, or other legal proceeding should be investigated or pursued.

76. Upon information and belief, when Defendants obtain and use DMV-sourced personal information, their purpose is to identify the registered owner, locate the owner's home address, generate a private parking invoice, and seek payment through their notice-based enforcement workflow. Defendants have not made any case-specific decision to file a lawsuit, initiate arbitration, refer the matter to counsel, or pursue any legal proceeding against the registered owner.

77. Upon information and belief, no attorney reviews the individual plate capture, DMV lookup, invoice, or unpaid account before Defendants obtain and use the registered owner's personal information. No case-specific legal evaluation is performed before the lookup to determine whether the registered owner was the driver, whether the alleged charge is enforceable, or whether any legal proceeding would have merit.

78. Defendants use DMV-sourced personal information to generate and send private parking invoices at scale. Their workflow is built around sending automated invoices, using payment deadlines and threatened non-litigation consequences to prompt payment, and collecting payment from recipients who pay after receiving the notice. It is not built around filing lawsuits or arbitrations. The predominant purpose of Defendants' DMV-data workflow is private billing and collection, not litigation.

79. Defendants' conduct was not specifically authorized under the law of the State under § 2721(b)(14). No Florida statute specifically authorizes private parking companies or their technology vendors to obtain, use, or disclose personal information from motor vehicle records to identify registered owners, locate their home addresses, or use DMV-sourced personal information for private parking charge notices.

80. The Parking Invoice did not identify any attorney, law firm, legal department, pending legal proceeding, contemplated legal proceeding, lawsuit, or arbitration. It threatened booting and towing, not litigation.

81. Upon information and belief, Premium and MPS use the same notice-based enforcement workflow across their managed private parking facilities. Similarly, upon information and belief, GovCIO operates an automated, high-volume registered-owner lookup service that processes license plate queries in bulk for private parking operators and their technology vendors, including Premium and MPS. The DMV-data retrieval process is standardized and automated, not a case-by-case legal investigation directed by counsel or tied to any specific legal proceeding.

82. Plaintiffs did not provide "express consent" for Defendants to obtain, use, or disclose their personal information from any motor vehicle record. The act of parking in or driving through a lot is not written consent. Being subject to posted signage is not written consent. No conduct at or related to the parking facility constitutes the written consent or electronically signed consent required by the DPPA. 18 U.S.C. § 2725(5).

83. Defendants' conduct was not for any other purpose enumerated in § 2721(b). It was not for use by or on behalf of a government agency; for motor vehicle or driver safety, theft, emissions, recalls, market research, or statistical reporting; by an insurer, licensed private investigator, employer, or commercial driver's license verifier for a permitted purpose; to provide notice concerning a towed or impounded vehicle; for bulk marketing or solicitation based on state-obtained consent; or for any other purpose authorized by the DPPA.

84. Plaintiffs' DPPA claims arise from Defendants' conduct in obtaining, using, and disclosing personal information from motor vehicle records. The claim does not depend on the existence, formation, enforceability, or breach of any alleged parking contract. Plaintiffs do not seek to enforce any alleged parking contract. Nor could any later-presented parking terms, payment terms, or website terms retroactively authorize Defendants' prior obtainment, use, or disclosure of Plaintiffs' DMV-sourced personal information.

**G. Concrete harm and standing allegations**

85. Defendants' conduct caused Plaintiffs concrete and particularized harm.

86. The first privacy injury occurred when Defendants obtained Plaintiffs' personal information, including Plaintiff Levine's name and home address and Plaintiff Deppe's name, from a motor vehicle record without a permitted purpose. Defendants accessed, requested, retrieved, or caused the retrieval of Plaintiffs' personal information from a DPPA-protected motor vehicle record. Plaintiffs had not

voluntarily disclosed that information to Defendants for private parking enforcement. Defendants obtained it without Plaintiffs' knowledge, authorization, or consent.

87. Defendants used Plaintiffs' license plate number to search for and retrieve personal information that Congress protected from unauthorized obtainment, use, and disclosure. By doing so, Defendants took information Plaintiffs had not given them and placed it into their private parking enforcement workflow.

88. Defendants also caused Plaintiffs to lose control over their DPPA-protected personal information. Before Defendants' conduct, Plaintiffs' name and/or home address, as linked to their license plate and vehicle registration, were not in Defendants' possession. After Defendants' conduct, that information was in the hands of Defendants and, upon information and belief, their vendors and downstream data recipients. Plaintiffs did not choose to give Defendants that information and had no practical ability to prevent the disclosure once it occurred.

89. Defendants caused a second, separate privacy injury to Plaintiff Levine specifically when they used and disclosed Plaintiff Levine's DMV-sourced personal information to send a private parking invoice to a home address Plaintiff Levine had never given them. The invoice came from a company Plaintiff had never dealt with, and was mailed to an address Defendants could not have obtained from the license plate capture alone. The invoice threatened booting and towing.

90. These privacy harms do not depend on time spent responding, subjective reaction, or any other individualized downstream consequence. They arise from

Defendants' obtainment, use, and disclosure of Plaintiffs' DPPA-protected personal information.

91. Plaintiffs provided their name and address to the State as part of the required vehicle-registration process. They did not give that information to Defendants, publish it for commercial use, or authorize Defendants to retrieve it for private parking enforcement.

92. Plaintiffs also spent time reviewing the mailed invoice, determining who Premium and MPS were, attempting to understand how Premium and MPS obtained their name and/or home address from a motor vehicle record, and evaluating the stated threats. That time was spent in direct response to the privacy invasions described above.

93. The privacy invasions described above, together with Plaintiffs' additional time injuries, constitute concrete and particularized injuries that are fairly traceable to Defendants' conduct and redressable by the remedies Congress provided for violations of the DPPA.

## CLASS ALLEGATIONS

94. Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23.

### A. Proposed Classes

95. For purposes of the proposed Classes, the "Class Period" means the four-year period before the filing of this action through the date of class certification.

96. Plaintiffs seek to represent the following Nationwide Premium Class:

> **All natural persons in the United States whose name, address, or other DPPA-protected personal information was obtained from, or derived from, a motor vehicle record and obtained, used, or disclosed by Premium, MPS, GovCIO, or their agents, vendors, or persons acting on their behalf to generate, mail, collect, or attempt to collect a private parking charge notice relating to a private parking facility operated, managed, or enforced by Premium and MPS during the Class Period.**

97. Plaintiffs also seek to represent, in the alternative or as a subclass, the following Nationwide Technology Defendant Class:

> **All natural persons in the United States whose name, address, or other DPPA-protected personal information was obtained from, or derived from, a motor vehicle record and obtained, used, or disclosed by GovCIO, or its agents, vendors, or persons acting on their behalf to generate, mail, collect, or attempt to collect a private parking charge notice relating to a privately owned, non-governmental parking facility using GovCIO's parking enforcement platform during the Class Period.**

98. In the alternative, or as a subclass, Plaintiffs seek to represent the following Florida Premium Class:

> **All natural persons whose name, address, or other DPPA-protected personal information was obtained from, or derived from, a motor vehicle record maintained by the Florida Department of Highway Safety and Motor Vehicles and obtained, used, or disclosed by Premium, MPS, GovCIO, or their agents, vendors, or persons acting on their behalf to generate, mail, collect, or attempt to collect a private parking charge notice relating to a private parking facility operated, managed, or enforced by Premium and MPS in Florida during the Class Period.**

99. Also in the alternative, or as a subclass, Plaintiffs seek to represent the following Georgia Premium Class:

**All natural persons whose name, address, or other DPPA-protected personal information was obtained from, or derived from, a motor vehicle record maintained by the Georgia Department of Driver Services and obtained, used, or disclosed by Premium, MPS, GovCIO, or their agents, vendors, or persons acting on their behalf to generate, mail, collect, or attempt to collect a private parking charge notice relating to a private parking facility operated, managed, or enforced by Premium and MPS during the Class Period.**

100. Excluded from each Class are Defendants; Defendants' officers, directors, employees, affiliates, parents, subsidiaries, and legal representatives; any entity in which any Defendant has a controlling interest; any person who timely and validly requests exclusion from the Class; and any judge presiding over this matter, together with the judge's immediate family members and judicial staff.

101. Plaintiffs reserve the right to amend, modify, or refine the Class definitions, and to seek certification of narrower classes, alternative classes, or subclasses, including state-specific subclasses, technology-vendor subclasses, operator-specific subclasses, and a subclass of persons who paid amounts in response to private parking charge notices generated, mailed, or collected using personal information obtained from motor vehicle records, based on discovery and further investigation.

**B. <u>Numerosity</u>**

102. Upon information and belief, the Class or Classes consist of hundreds, if not thousands, of members. Premium and MPS operate private parking enforcement programs at numerous locations across Florida and other states. Premium and MPS use a standardized system to capture license plate numbers, obtain registered-owner

information from motor vehicle records, and generate and mail private parking notices.

103. Upon information and belief, GovCIO's parking enforcement platform is not limited to Premium. Upon information and belief, GovCIO provides or supports substantially similar private parking enforcement workflows for other private parking operators, including workflows that use LPR captures, registered-owner lookups, notice generation, mailing, and payment processing.

104. Class members can be identified through Defendants' records, including license plate capture records, registered-owner lookup records, DMV query records or vendor-supplied owner-information records, Defendants' platform records, operator/client identifiers, facility/location identifiers, notice-generation records, mailing records, and payment records. Joinder of all members is impracticable.

## C. Commonality

105. Common questions of law and fact exist and are capable of classwide resolution, including:

a. Whether Defendants used a standardized workflow to obtain registered-owner names, addresses, or other DPPA-protected personal information from motor vehicle records, or from vendors, databases, or other motor-vehicle-record-derived sources.

b. Whether Defendants used or disclosed DMV-sourced personal information to generate, mail, collect, or attempt to collect private parking charge notices.

c. Whether GovCIO obtained, used, disclosed, processed, stored, or transmitted DMV-sourced personal information in connection with Premium's and MPS's private parking enforcement workflow.

d. Whether GovCIO used the same or substantially similar DMV-data workflow for Premium, MPS, and other private parking operators.

e. Whether obtaining, using, or disclosing DMV-sourced personal information to generate, mail, collect, or attempt to collect private parking charge notices is a purpose permitted under the DPPA.

f. Whether Defendants' conduct falls within any permissible use under 18 U.S.C. § 2721(b).

g. Whether Defendants obtained "express consent" within the meaning of 18 U.S.C. § 2725(5).

h. Whether Defendants acted knowingly, willfully, or with reckless disregard of the DPPA.

i. Whether Defendants' obtainment, use, or disclosure of DMV-sourced personal information caused the same DPPA privacy injury to Plaintiff and Class members.

j. Whether actual damages, liquidated damages, punitive damages, attorneys' fees, costs, and declaratory relief are available under the DPPA.

**D. <u>Typicality</u>**

106. Plaintiffs' claims are typical of the claims of the Class or Classes because they arise from the same standardized system and practices used for Class members. Plaintiffs' claims also arise from the same legal theory: Defendants obtained, used, or disclosed DMV-sourced personal information for private parking enforcement without a DPPA-permitted purpose. Plaintiffs' claims against GovCIO are typical of the Nationwide Technology Defendant Class because they arise from the same or substantially similar platform and DMV-data workflow alleged above.

**E. Adequacy**

107. Plaintiffs will fairly and adequately represent the interests of the Class or Classes. Their claims arise from the same standardized conduct as the claims of absent Class members, and their interests are aligned with theirs. Plaintiffs have no interests antagonistic to the Class or Classes.

108. Plaintiffs have retained counsel experienced in class action, privacy, and DPPA litigation. Plaintiffs and their counsel will prosecute this action on behalf of the Class or Classes.

**F. Predominance and Superiority**

109. Questions of law and fact common to the Class or Classes predominate over any questions affecting only individual members. Defendants' liability turns on common, standardized conduct: whether Defendants obtained, used, or disclosed DMV-sourced personal information through their private parking enforcement workflow for a purpose not permitted by the DPPA.

110. The central issues can be resolved through common proof, including Defendants' license plate capture records, registered-owner lookup records, DMV query records, vendor records, GovCIO's platform records, operator/client records and identifiers, notice-generation records, mailing records, payment records, policies, procedures, terms, and data-sharing agreements. Those records can show whose information was obtained, how it was obtained, how it was used, to whom it was disclosed, and whether Defendants used the same or substantially similar workflow across Class members.

111. The Class claims do not depend on individualized proof of each Class member's subjective reaction to a notice, time spent responding, reason for payment, or emotional response. The common privacy injury arises from Defendants' obtainment, use, and disclosure of DMV-sourced personal information for private parking enforcement. Any individualized issues concerning actual damages, payments, or downstream consequences can be addressed separately, including through subclasses, claims administration, or other case-management tools if necessary.

112. A class action is superior to individual actions. The DPPA provides meaningful statutory remedies, but individual claims are still too small in relation to the cost of federal litigation to make separate actions practical for most Class members. A class action will efficiently resolve the legality of Defendants' standardized DMV-data workflow in one proceeding, avoid inconsistent adjudications, and provide a practical means of relief for persons whose protected motor vehicle information was obtained, used, or disclosed through that workflow.

**G. <u>Ascertainability</u>**

113. Class members are ascertainable from Defendants' own business records. Upon information and belief, Defendants maintain records sufficient to identify license plate captures, registered-owner lookups, DMV query records or vendor-supplied registered-owner information, GovCIO's platform records, operator/client identifiers, facility/location identifiers, notices generated, notices mailed, amounts demanded, payments received, and account histories.

114. These records can identify the persons whose names, addresses, or other DPPA-protected personal information were obtained, used, or disclosed to generate, mail, collect, or attempt to collect private parking charge notices. The Class or Classes can therefore be identified through objective criteria without individualized inquiry into any Class member's subjective circumstances, reaction to a notice, time spent responding, or reason for paying or not paying.

**COUNT I**
**VIOLATION OF THE DPPA, 18 U.S.C. § 2724(a)**
(Against Premium)

115. Plaintiffs incorporate by reference paragraphs 1 through 114.

116. Premium is a "person" within the meaning of 18 U.S.C. § 2725(2).

117. Premium knowingly obtained, or caused to be obtained, personal information, including names and home addresses, from motor vehicle records for Plaintiffs and members of the Nationwide Premium Class, Florida Premium Class, and Georgia Premium Class. Premium did so by using captured license plate numbers to obtain registered-owner information from state motor vehicle records, or from vendors, databases, or data sources that obtain registered-owner information from motor vehicle records.

118. The personal information Premium obtained, or caused to be obtained, pertained to Plaintiffs and members of the Nationwide Premium Class, Florida Premium Class, and Georgia Premium Class within the meaning of 18 U.S.C. § 2724(a).

119. Premium knowingly used personal information from motor vehicle records for Plaintiffs and members of the Nationwide Premium Class, Florida Premium Class, and Georgia Premium Class to create enforcement records, generate private parking charge notices, mail or cause those notices to be mailed to their homes or addresses obtained from motor vehicle records, and collect or attempt to collect amounts demanded in those notices.

120. Premium knowingly disclosed personal information from motor vehicle records for Plaintiffs and members of the Nationwide Premium Class, Florida Premium Class, and Georgia Premium Class to GovCIO and mailing vendors to generate, print, mail, process, or support private parking charge notices and related communications.

121. Upon information and belief, Premium also disclosed DMV-sourced personal information, or notice, account, and payment-related information associated with DMV-sourced personal information, to payment-related vendors, collection vendors, booting vendors, towing vendors, or other downstream vendors involved in Defendants' enforcement workflow.

122. Premium obtained, used, and disclosed this personal information for purposes not permitted under 18 U.S.C. § 2721(b).

123. Plaintiffs and members of the Nationwide Premium Class, Georgia Premium Class, and Florida Premium Class did not provide "express consent" as defined by 18 U.S.C. § 2725(5).

124. Premium's conduct was knowing, willful, and in reckless disregard of the DPPA. Premium designed, implemented, and operates a standardized system that obtains, uses, and discloses DMV-sourced personal information to pursue private parking charges without any permissible purpose under 18 U.S.C. § 2721(b).

125. As a direct result of Premium's DPPA violations, Plaintiffs and members of the Nationwide Premium Class, Georgia Premium Class, and Florida Premium Class suffered the concrete privacy harms alleged above, including the unauthorized obtainment, use, and disclosure of their DMV-sourced personal information. Plaintiffs also suffered the additional time-related harms alleged above.

WHEREFORE, Plaintiffs, individually and on behalf of the Class or Classes, respectfully request that the Court enter judgment against Premium on Count I and grant the relief requested in the Prayer for Relief below.

**COUNT II**
**VIOLATION OF THE DPPA, 18 U.S.C. § 2724(a)**
(Against MPS)

126. Plaintiffs incorporate by reference paragraphs 1 through 114.

127. MPS is a "person" within the meaning of 18 U.S.C. § 2725(2).

128. MPS knowingly obtained, or caused to be obtained, personal information, including names and home addresses, from motor vehicle records for Plaintiffs and members of the Nationwide Premium Class, Georgia Premium Class, and Florida Premium Class. MPS did so by using captured license plate numbers to obtain registered-owner information from state motor vehicle records, or from

vendors, databases, or data sources that obtain registered-owner information from motor vehicle records.

129. The personal information MPS obtained, or caused to be obtained, pertained to Plaintiffs and members of the Nationwide Premium Class, Georgia Premium Class, and Florida Premium Class within the meaning of 18 U.S.C. § 2724(a).

130. MPS knowingly used personal information from motor vehicle records for Plaintiffs and members of the Nationwide Premium Class, Georgia Premium Class, and Florida Premium Class to create enforcement records, generate private parking charge notices, mail or cause those notices to be mailed to their homes or addresses obtained from motor vehicle records, and collect or attempt to collect amounts demanded in those notices.

131. MPS knowingly disclosed personal information from motor vehicle records for Plaintiffs and members of the Nationwide Premium Class, Georgia Premium Class, and Florida Premium Class to Premium, GovCIO, and mailing vendors to generate, print, mail, process, or support private parking charge notices and related communications.

132. Upon information and belief, MPS also disclosed DMV-sourced personal information, or notice, account, and payment-related information associated with DMV-sourced personal information, to payment-related vendors, collection vendors, booting vendors, towing vendors, or other downstream vendors involved in Defendants' enforcement workflow.

133. MPS obtained, used, and disclosed this personal information for purposes not permitted under 18 U.S.C. § 2721(b).

134. Plaintiffs and members of the Nationwide Premium Class, Georgia Premium Class, and Florida Premium Class did not provide "express consent" as defined by 18 U.S.C. § 2725(5).

135. MPS's conduct was knowing, willful, and in reckless disregard of the DPPA. MPS designed, implemented, and operates a standardized system that obtains, uses, and discloses DMV-sourced personal information to pursue private parking charges without any permissible purpose under 18 U.S.C. § 2721(b).

136. As a direct result of MPS's DPPA violations, Plaintiffs and members of the Nationwide Premium Class, Georgia Premium Class, and Florida Premium Class suffered the concrete privacy harms alleged above, including the unauthorized obtainment, use, and disclosure of their DMV-sourced personal information. Plaintiffs also suffered the additional time-related harms alleged above.

WHEREFORE, Plaintiffs, individually and on behalf of the Class or Classes, respectfully request that the Court enter judgment against MPS on Count II and grant the relief requested in the Prayer for Relief below.

**COUNT III**
**VIOLATION OF THE DPPA, 18 U.S.C. § 2724(a)**
(Against GovCIO)

137. Plaintiffs incorporate by reference paragraphs 1 through 114.

138. GovCIO is a "person" within the meaning of 18 U.S.C. § 2725(2).

139. GovCIO knowingly obtained, or caused to be obtained, Plaintiffs' and the Class members' personal information, including names and home addresses, from motor vehicle records. GovCIO did so by using captured license plate numbers to obtain registered-owner information from state motor vehicle records, or from vendors, databases, or data sources that obtain registered-owner information from motor vehicle records.

140. The personal information GovCIO obtained, or caused to be obtained, pertained to Plaintiffs and the Class members within the meaning of 18 U.S.C. § 2724(a).

141. Upon information and belief, GovCIO knowingly used Plaintiffs' and the Class members' personal information from motor vehicle records by storing, processing, matching, transmitting, or making that information available within Premium's and MPS's enforcement platform or systems, and by using that information to support notice generation, mailing, enforcement, collection, and payment workflows.

142. Upon information and belief, GovCIO knowingly disclosed Plaintiffs' and the Class members' personal information from motor vehicle records by transmitting that information to Premium, MPS, mailing vendors, payment vendors, and other vendors or agents acting at Premium, MPS, or GovCIO's direction.

143. GovCIO obtained, used, and disclosed this personal information for purposes not permitted under 18 U.S.C. § 2721(b).

144. Plaintiffs and the Class members did not provide "express consent" as defined by 18 U.S.C. § 2725(5).

145. GovCIO's conduct was knowing, willful, and in reckless disregard of the DPPA. GovCIO provided or supported parking enforcement workflows that obtain, use, and disclose DMV-sourced personal information to pursue private parking charges without any permissible purpose under 18 U.S.C. § 2721(b), including workflows used for Premium, MPS, and other private parking operators.

146. As a direct result of GovCIO's DPPA violations, Plaintiffs and the Class members suffered the concrete privacy harms alleged above, including the unauthorized obtainment, use, and disclosure of their DMV-sourced personal information. Plaintiffs also suffered the additional time-related harms alleged above.

WHEREFORE, Plaintiffs, individually and on behalf of the Class or Classes, respectfully request that the Court enter judgment against GovCIO on Count III and grant the relief requested in the Prayer for Relief below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class or Classes, respectfully request:

a. An order certifying the Class or Classes, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

b. An order declaring that Defendants' conduct violates the DPPA;

c. An award of actual damages or liquidated damages of $2,500, whichever is greater, for each DPPA violation, for Plaintiffs and each member of the applicable Class or Classes under 18 U.S.C. § 2724(b)(1);

d. An award of punitive damages for willful or reckless disregard of the DPPA under 18 U.S.C. § 2724(b)(2);

e. An award of reasonable attorneys' fees and costs under 18 U.S.C. § 2724(b)(3);

f. Prejudgment and post-judgment interest as allowed by law; and

g. Such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class or Classes, demand a trial by jury on all issues so triable.

Dated: May 22, 2026

Respectfully submitted,

**MARK FERRER & HAYDEN**
80 S.W. 8th Street, Suite 1999
Miami, Florida 33130

By: *s/Charles M. Garabedian*
Charles M. Garabedian, Esq.
Florida Bar No. 1000974
Victor Sanabria, Esq.
Florida Bar No. 125292
victor@mfh.law
charles@mfh.law
eservice@mfh.law

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document electronically on the Court's CM/ECF docket on May 22, 2026, which served same electronically upon all counsel of record.

By: *s/ Charles M. Garabedian*