**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

STEVE LEVINE and JAQUELYN DEPPE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

Case No. 8:25-cv-2920-KKM-NHA

MUNICIPAL PARKING SERVICES, INC., PREMIUM PARKING SERVICE, LLC, and GOVCIO, LLC,

Defendants.

---

**DEFENDANTS PREMIUM PARKING SERVICE, LLC AND MUNICIPAL PARKING SERVICES, INC.'S MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT WITH PREJUDICE AND INCORPORATED MEMORANDUM OF LAW**

Defendants Premium Parking Service, LLC ("Premium") and Municipal Parking Services, Inc. ("MPS") ("Defendants"), pursuant to Federal Rules of Civil Procedure 12(b)(1), and 12(b)(6), move to dismiss the Amended Class Action Complaint ("ACC") with prejudice. Plaintiffs' claim fails as a matter of law for the following reasons:

- First, both named plaintiffs lack Article III standing. Plaintiffs' alleged DPPA violations are not sufficiently analogous to common law claims of invasion of privacy such as to render the harm concrete.
- Second, Plaintiffs have failed to state a claim because MPS and Premium's alleged use of personal information falls within permissible use 4 of the DPPA.

# MEMORANDUM OF LAW

## I. FACTUAL BACKGROUND

### A. PREMIUM AND MPS'S OPERATIONS

Premium manages private parking facilities throughout the United States. ACC ¶ 25. MPS provides camera technology to Premium in Florida and throughout the United States for use in parking enforcement. ACC ¶ 26. When vehicles enter a private parking facility equipped with MPS's technology, cameras capture images of the vehicle, including the license plate. *Id.* If MPS's systems determine that a parking charge is owed, they send images of the license plate to third-party vendors, who then match the vehicle owner's name and home address to send the owner a charge for the consumed parking. *Id.* ¶¶ 29, 30, 31. MPS and Premium's parking enforcement operations are legal pursuant to Fla. Stat. § 715.075, Florida Statutes.

### B. PLAINTIFFS' ASSERTED CLAIMS

Levine alleges that on October 7, 2025, his daughter parked his vehicle at a private parking facility managed by Premium in Redington Shores, Florida, equipped with MPS's camera system. *Id.* ¶ 39. MPS cameras captured images of Levine's license

plate and recorded entry and exit times. *Id* at ¶ 40. When Levine's daughter failed to pay for her parking, he received a $75 Parking Invoice at his Pinellas Park, Florida, address because he was the registered owner of the vehicle that parked in the lot. *Id.* ¶¶ 43, 44. At no point does Levine dispute the amount charged or allege he paid the outstanding parking charge prior to receiving the invoice in the mail. *See id.* ¶¶ 39 - 47.

Deppe alleges that on April 26, 2025, she drove through a Premium-managed parking lot located in Redington Shores, Florida, equipped with MPS's camera system. *Id.* at ¶¶ 48, 49. MPS cameras captured Deppe's license plate and recorded entry and exit times. *Id.* at ¶ 50. When Deppe failed to pay for her use of the parking lot, she received a $75 Parking Invoice at her Pinellas County, Florida, address because she was the registered owner of the vehicle that entered and exited the lot. *Id.* at ¶¶ 3, 48, 54. At no point does Deppe allege she paid the outstanding parking charge prior to receiving the invoice in the mail. *See generally id* ¶¶ 48 - 57. Nor does she allege that she availed herself of the dispute and appeal process to challenge the violation.

Nonetheless, Plaintiffs generally allege that when they received the ordinary envelope containing their name and address, they experienced "privacy injur[ies]." ACC ¶¶ 86, 89. Plaintiffs seek to bring a putative class action seeking statutory damages and attorneys' fees on behalf of other individuals who experienced the same alleged harms following unpaid parking sessions. *Id.* ¶ 146.

## II. OVERVIEW OF THE DPPA AND PERMISSIBLE USE EXCEPTIONS TO LIABILITY

At its core, the DPPA is a crime-prevention statute. Rebecca Schaeffer, a prominent television actress, was murdered by a stalker, who had obtained her personal information from a state department of motor vehicles ("DMV") database. *See Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1260 n.1 (9th Cir. 2019). In response, Congress passed the DPPA as part of a comprehensive set of laws aimed at preventing crimes of this nature using state-gathered personal identifying information.

The DPPA is a "public safety statute designed to protect citizens." *Gaston v. LexisNexis Risk Solutions, Inc.*, 483 F. Supp. 3d 318, 333 (W.D.N.C. 2020). The restrictions in the DPPA reflect a legislative intent to protect victims of crimes committed using DMV records. *Taylor v. Acxiom Corp.*, 612 F.3d 325, 336 (5th Cir. 2010). Congress did not intend for these restrictions to "suppress legitimate business uses of motor vehicle records." *Id.*

The DPPA makes it "unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." 18 U.S.C. § 2721(a)(1). Critically, the focus of the DPPA is in protecting the release and use of information from state DMV motor vehicle records in the first instance, as opposed to use of information from public sources that can eventually be traced back to a state motor vehicle record. *See Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 926 (4th Cir. 2022) ("The DPPA imposes civil liability only on a defendant who obtains personal information *from* a motor vehicle

record, but not on a defendant who merely obtains personal information that can be linked back to . . . such a record."); *Siegler v. Best Buy Co. of Minn., Inc.*, 519 F. App'x. 604, 605 (11th Cir. 2013) ("A plain reading of the DPPA makes clear that the Act was intended to prohibit only the disclosure or redisclosure of information originating from state department of motor vehicles ('DMV') records.").

The DPPA outlines 14 permissible uses of "personal information" under the statute. Of those, one is pertinent to this motion. Permissible use 4 allows use of personal information:

> For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

18 U.S.C. § 2721(b)(4).

Plaintiffs' claims come nowhere near the intended purposes of crime-fighting for which the entire DPPA scheme exists. To the contrary, Plaintiffs recast themselves as privacy victims after the vehicles they owned entered a paid lot, benefitted from a parking service, and left without paying for the service. In effect, as Judge Singhal of the Southern District of Florida recently commented, "Plaintiff and those he represents have easily met the definition of Theft under Florida Statute § 812.014(1)(a)", and yet, after having absconded with free parking, Plaintiffs paint the efforts required to identify them as the owners of the vehicles and hold them responsible for the fees owed as an injury in fact sufficient to grant them standing. *Jeanmary et al. v. Professional Parking Management Corporation*, Case No. 0:24-cv-61213, Dkt. 61, p. 3 (S.D. Fla. February 5,

2026) ("*Jeanmary Order*"), attached as **Exhibit A**; *see also Cicale v. Professional Parking Management Corporation*, Case No. 0:24-cv-61146, Dkt. 73, p. 3 (S.D. Fla. April 30, 2026) (hereinafter "*Cicale Order*"), attached as **Exhibit B**.

Plaintiffs have stolen a benefit extended to them by Defendants and therefore sustained no injury that is traceable to the actual conduct at issue. In all events, the efforts to identify Plaintiffs and present them with the invoice for payment falls squarely within permissible use 4 of the DPPA itself.

## III. ARGUMENT

### A. PLAINTIFFS LACK STANDING TO ASSERT THEIR DPPA CLAIMS

Both Plaintiffs lack Article III standing to assert their claims against Defendants. The ACC alleges that Plaintiffs have been harmed by alleged "privacy injur[ies]", and time and effort spent investigating and reviewing the charge at issue. *See* ACC ¶¶ 86, 89, 92, 93. Plaintiffs seek to recover statutory damages. *Id.* ¶ 146. However, Plaintiffs fail to allege an injury-in-fact to support standing under Federal Rule of Civil Procedure 12(b)(1) and fail to state a claim under the DPPA under Federal Rule of Civil Procedure 12(b)(6). Article III standing is jurisdictional, and therefore, constitutes a threshold inquiry. *Stalley v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).

#### 1. Plaintiffs Cannot Establish Injury-In-Fact.

To demonstrate standing, a plaintiff must establish three elements: (1) he has suffered an injury-in-fact; (2) the injury is "fairly traceable to the challenged conduct

of the defendant"; and (3) the injury is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An "injury-in-fact" is "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). A procedural violation of a statute, without any concrete harm, cannot satisfy Article III injury-in-fact. *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1242-44 (11th Cir. 2022) (en banc) ("A bare statutory violation is not enough, no matter how beneficial we think the statute may be.").

"Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (emphasis in original). The Supreme Court confirmed in *TransUnion* that Congress may not "simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id.* at 426. Nor may Congress "statutorily procure an injury from thin air." *Davis v. Prof. Parking Mgmt. Corp.*, 2023 WL 4542690, at *2 (11th Cir. July 14, 2023). "Only factual allegations, and not legal conclusions, are relevant to our inquiry, and 'mere conclusory statements ... do not suffice.'" *Glynn Envtl. Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1240 (11th Cir. 2022).

Plaintiffs allege that they suffered intangible "privacy injur[ies]" stemming from Defendants' 1) obtaining Plaintiffs' personal information from a motor vehicle record

and 2) the use and disclosure of Levine's personal information to generate and send the parking invoice. ACC at ¶¶ 86, 89.

In *Jeanmary v. Professional Parking Management Corporation*, Judge Singhal faced a similar standing challenge to a DPPA claim where plaintiff, like here, alleged he suffered intangible harms, including invasion of privacy and intrusion upon seclusion, and tangible harms stemming from being required to pay a ticket that defendant sent plaintiff. *See Jeanmary Order*, p. 4. Like here, *Jeanmary* involved a putative class action by a plaintiff who sued a parking facility operator for an alleged DPPA violation stemming from plaintiff parking at a parking facility defendant managed and failing to pay for parking. *Id.* at p. 2. Because defendant allegedly collected the license plate information of parkers at that parking lot, after plaintiff failed to pay, the defendant reached out to the DMV to acquire plaintiff's name and address and then sent plaintiff a parking charge for the outstanding parking amount. *Id.* Plaintiff alleged that he was harmed tangibly by having to pay the parking charge and that he was harmed intangibly by defendant's "accessing [plaintiff's] DMV records, [defendant] invaded [plaintiff's] privacy, intruded upon [plaintiff's] personal and private space, harassed [and] annoyed [plaintiff], caused a nuisance, and violated [plaintiff's] statutory privacy rights." *Id.*

Judge Singhal ruled that plaintiff and the putative class members failed to allege an injury-in-fact sufficient to establish standing and dismissed the complaint. *Id.* at pp. 5-6. The court reasoned that plaintiff "utilized Defendant's services, under their business model, and left without paying, only to then complain in the form of a federal

lawsuit about the method of collection" meaning that the court did not need to address "the DMV record lookup" because, out the outset, each plaintiff "used Defendant's property and failed to pay for that use." *Id.* at p. 3. As applied, on the alleged tangible harm, the court found plaintiff failed to state a claim because plaintiff did "not allege that he did not owe the money he paid" and merely "receiving a bill for services accepted is not a legal injury." *Id.* at p. 6.

On the alleged intangible harm, the court first found plaintiff failed to satisfy their pleading burden because, while plaintiff alleged that defendant's DPPA violation caused harms like invasions of privacy or intrusion upon seclusion, such allegations are "bare bones conclusion[s] of law, not [] factual allegation[s] of harm." *Id.* at p. 5. Critically, plaintiff never alleged "*how* he was actually hurt." *Id.* Plaintiff made no factual allegations describing "how he was harassed or how his privacy and solitude were actually injured . . . [and thus] fail[ed] to allege[] that he was pained by [defendant's] actions . . . [thereby] fall[ing] short of claiming that he suffered an intangible injury to his privacy." *Id.* Even if plaintiff's claims weren't conclusory, however, the court still found plaintiff failed to allege an injury-in-fact because the plaintiff failed to analogize the alleged DPPA violation to common law invasion of privacy claims. *Id.* at p. 5. Specifically, statutory privacy rights, like intrusion upon seclusion or invasion of privacy, under Florida law, require demonstration of intrusion "into a 'place[.]'" *Id.* at p. 5. Under Florida law, however, "[a]ccessing motor vehicle records is not equivalent to an intrusion into a "place." *Id.* Thus, the court ordered that plaintiff's claim must be dismissed due to failure to allege an injury-in-fact. *Id.* at p. 6-

7. In a separate action, *Cicale v. Professional Parking Management Corporation*, Judge Singhal recently granted a motion to dismiss a second amended complaint based on identical reasoning. *See Cicale Order*, p. 8.

*Jeannary* and *Cicale* are on all fours, and Defendants urge the Court to follow them and dismiss Plaintiffs' claims. Like in *Jeanmary* and *Cicale*, the ACC alleges that Plaintiffs here "used Defendant's property and failed to pay for that use." *Id.* at p. 3; ACC ¶¶ 39, 48. Levine never challenges that he owes the money stated on the parking charge resulting from his daughter's admitted use of Defendants' services. ACC ¶ 39. Although Deppe allegedly challenges the money stated on the parking charge, she also admittedly 1) used Defendants' services, twice, to both drop off and pick up her family 2) to enjoy a benefit of Defendants' parking lot, chiefly, access to the beach 3) without paying for the privilege of doing so. *Id.* at ¶¶ 48, 53. Thus, just like in *Jeanmary* and *Cicale*, both Plaintiffs here "used Defendant's property and failed to pay for that use[]", meaning they suffered no tangible harm and thus the Court is justified in ordering dismissal. *See Cicale Order*, p. 8.

As it concerns intangible harms, like the plaintiffs in *Jeanmary* and *Cicale*, Plaintiffs allege that they suffered "privacy injur[ies][.]" ACC ¶ 86, 89. However, these claimed injuries fare no better here than they did in *Jeanmary* and *Cicale*.

First, like in *Jeanmary* and *Cicale*, at no point do Plaintiffs describe the how or why of their alleged privacy injuries. Neither Levine nor Deppe allege how MPS or Premium's alleged actions apparently harmed them or how or why the letters sent

caused them to feel violated or embarrassed or aggrieved. *See generally* ACC ¶¶ 47, 57. In fact, Plaintiffs go so far as to admit that it is not their job to allege as such, asserting, against the weight of the law, that "[t]hese privacy harms do not depend on time spent responding, subjective reaction, or any other individualized downstream consequences." *Id.* at ¶ 90. Such an assertion runs against the weight of authority relied on in both the *Jeanmary* and *Cicale* Orders. *See Jeanmary Order*, pp. 4-5; *Cicale Order*, p. 5. Plaintiffs' bare allegation that Defendants caused Plaintiffs to "lose control over their DPPA-protected personal information" fails for similar reasons. *Id.* at ¶ 88. In the data breach context, "[d]istrict [c]ourts in this circuit have generally declined to recognize a concrete injury based on conclusory allegations of loss of privacy in the data breach context unless those allegations are coupled with 'a substantial and imminent risk of future identity theft[.]'" *Manning v. Zumpano Patricios, P.A.*, No. 25-CV-23184, 2025 WL 3062563, at *8 (S.D. Fla. Nov. 3, 2025), *appeal dismissed*, No. 25-14259-FF, 2026 WL 607309 (11th Cir. Feb. 11, 2026) (quoting *DiPierro v. Florida Health Scis. Ctr., Inc.*, 737 F. Supp. 3d 1314, 1327 (M.D. Fla. 2024)). As applied, Plaintiffs have not only failed to allege any form of harm resultant from such "loss of control", but they have also failed to allege any kind of imminent risk of future identity theft that would grant them standing for making such a claim. ACC at ¶ 88.

Thus, the ACC fails to provide the sufficient factual allegations necessary to support Plaintiffs' claims and instead merely asserts "bare bones conclusion[s] of law, not [] factual allegation[s] of harm[]", justifying the Court in dismissing Plaintiffs' claims. *Jeanmary Order*, p. 5; *Cicale Order*, p. 5; *see also Cicale v. Prof'l Parking Mgmt. Corp.*,

2025 WL 3541417, at *4 (S.D. Fla. Sept. 11, 2025) (dismissing plaintiff's initial complaint asserting an alleged DPPA violation because "the Complaint is devoid of factual allegations about [Plaintiff's] supposed distress.").

Second, in addition to asserting mere conclusions of law, Plaintiffs' argument fails because they do not sufficiently analogize the violation of their statutory rights to an analogous common law cause of action to save their claim. *See Hunstein*, 48 F.4th at 1242-44. In Florida, for a statutory violation to be sufficiently analogous to a common law cause of action Plaintiffs must satisfy all elements of the common law tort they claim is analogous. *Id.* Plaintiffs' ACC does not do this. "Under Florida law, establishing invasion of privacy requires a physical or electronic intrusion 'into a 'place' in which there is a reasonable expectation of privacy ...'" *Cicale*, 2025 WL 3541417, at *4 (quoting *Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003)). Moreover, Florida courts have held that accessing data contained in a motor vehicle record is not an intrusion into a place sufficient to make out an invasion of privacy claim. *See id.; see also In re Mun. Parking Services, Inc. DPPA Litig.,* 2025 WL 1475794, at *4-5 (N.D. Fla. Feb. 12, 2025) (ruling that plaintiff failed to establish that intangible harms suffered pursuant to alleged DPPA violation were sufficient to confer standing because "DMV records are not a place in which Plaintiffs had a reasonable expectation of privacy at common law."); *Watts v. City of Hollywood, Florida*, 146 F. Supp. 3d 1254, 1267 (S.D. Fla. 2015) ("The City's accessing of Watts's driver's license information in the DAVID system is likewise not an intrusion into a 'place.'"). Because Plaintiffs'

alleged privacy injuries are fundamentally predicated on an alleged intrusion only into their DMV record, their claims must be dismissed. ACC ¶ 86.

In short, at no point do Plaintiffs allege they did not owe the money stated in the parking charge. *See generally* ACC. This is because, as Plaintiffs admit, they both used Defendants' services without paying. Levine admits that his daughter, using his car, parked at a private parking facility in Redington Shores, left the parking facility without paying, and later received a parking invoice of $75.00 for the benefit of parking at said parking facility which Levine at least does not allege he paid. ACC ¶¶ 39, 47. Deppe admits that she and her family entered a Premium parking facility for the express purpose of enjoying a benefit of said parking facility (beach access), left the parking facility without paying, and later received a parking invoice of $75.00 for the benefit of using said facility which Deppe also does not allege that she paid. *Id.* at ¶¶ 48, 57. Thus, like in *Jeanmary* and *Cicale*, Plaintiffs here "utilized Defendant's services, under their business model, and left without paying, only to then complain in the form of a federal lawsuit about the method of collection", in other words, they committed "[t]heft under Florida Statute § 812.014(1)(a)", and thus should have the ACC dismissed. *Jeanmary Order*, p. 3; *Cicale Order*, p. 3.

Plaintiffs' alleged "privacy injur[ies]" are also founded on allegations that Levine received letters at his home, not intrusion into motor vehicle records, and that Plaintiffs have alleged a sufficient tangible harm because they "spent time reviewing the mailed invoice, determining who Premium and MPS were, attempting to understand how Premium and MPS obtained their name and/or home address from

a motor vehicle record, and evaluating the stated threats." ACC ¶¶ 89, 92. These allegations are insufficient to confer standing.

Receiving requests to pay, which the Notices of Parking Violations are, are not analogous to invasions of privacy or intrusion upon seclusion causes of action, and do not give rise to an injury. The Eleventh Circuit has already held that, absent allegations that a plaintiff "'made any payments in response to the defendants' letters[,]'" letters sent by defendants alone "are not actionable[.]" *Davis v. Prof. Parking Mgmt. Corp.*, 2023 WL 4542690, at *2-3 (11th Cir. July 14, 2023). Likewise, courts in Florida have similarly held that plaintiffs "lack[] support for [the] position that receiving an unwanted debt letter causes the same kind of harm as an intrusion upon seclusion at common law." *Heres v. Medicredit, Inc.*, 2024 WL 3291738, at *11 (S.D. Fla. July 3, 2024). Plaintiffs here did not use the dispute process to challenge the parking charge amount. They instead only dispute how it was sent. Courts in other circuits, dealing with analogous alleged DPPA violations, have ruled that "[d]espite Plaintiffs' frustrations with Defendants' practices, receiving letters in the mail for unpaid bills would not be highly offensive to a reasonable person." *See Andrew Stegmeyer, et al., v. ABM Industries Incorporated,* 2026 WL 879588, at *4-5 (N.D. Ill. Mar. 30, 2026).

On the second point, Plaintiffs have suffered no "wasted time" such as to grant them standing because at no point do Plaintiffs allege that they disputed or otherwise claimed to not owe the amount stated on the parking charge. This distinguishes this case from *In re Municipal Parking Services, Inc. DPPA Litigation*, where the court allowed "wasted time" allegations to go forward as a concrete injury because the plaintiffs

disputed the invoices received from the defendant. 2025 WL 1475794, at *5. Here, Plaintiffs do not allege they spent time disputing the charge at issue. *See* ACC ¶ 47, 53. Deppe's allegation that she did not owe the amount stated on the parking invoice squarely contradicts with Plaintiff's own admission that she used a benefit of the parking lot (beach access) for the benefit of herself and her family members without paying. *Compare id.* at ¶ 53 *with id.* at ¶ 48.

Paragraphs 89 and 92 fall short for two additional reasons. First, as in *Jeanmary* and *Cicale*, any harm that Plaintiffs allege didn't arise from the DPPA violation, it arose from both Levine's daughter using his vehicle to consume Defendants' services and Deppe using a benefit of the parking facility for her and her family's enjoyment without paying for the privilege of doing so. Being found and presented with a charge after the theft of a service is not a concrete constitutional injury at law. Second, as Plaintiffs admit, the time and effort they allegedly spent was not "wasted" but was rather done in anticipation of litigation since it was spent researching Defendants and identifying how the data was obtained. ACC ¶¶ 47, 57. As the Eleventh Circuit recognized, time and money spent on a lawsuit "itself cannot give rise to a concrete injury for Article III standing purposes." *Toste v. Beach Club at Fontainebleau Park Condo. Ass'n, Inc.*, 2022 WL 4091738, at *4 (11th Cir. Sept. 7, 2022); *see Heres,* 2024 WL 3291738, at *8 ("[A] plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit[.]").

### B. MPS AND PREMIUM SATISFY PERMISSIBLE USE 4 UNDER 18 U.S.C. § 2721(b)(4)

The ACC also should be dismissed because, as a matter of law, MPS and Premium satisfy permissible use 4 under the DPPA. To establish DPPA liability, a plaintiff must show: (1) the defendant knowingly obtained, disclosed, or used personal information, (2) from a motor vehicle record, and (3) for a purpose not permitted. *Taylor*, 612 F.3d at 335. "[C]onclusory allegations" are not enough. *McDonough v. City of Homestead, Fla.*, 2021 WL 9276283, at *4 n.4 (S.D. Fla. Sept. 1, 2021).

The DPPA expressly authorizes the use of DMV information "in connection with" any proceeding or for use in "investigation in anticipation of litigation." 18 U.S.C. § 2721(b)(4).

"The plain language" of § 2721(b)(4) is "extremely broad." *Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King & Stevens, P.A.*, 2006 WL 8431100, at *5 (S.D. Fla. Nov. 7, 2006). Under the DPPA it does not matter whether the information was ever used in an adjudicatory proceeding, if the information was intended for potential use in a future proceeding, it is a permitted use. *Welch v. Jones*, 770 F. Supp. 2d 1253, 1259 (N.D. Fla. 2011) ("Had Congress intended § 2721(b) to require actual use – rather than only a purpose to use when appropriate – it could have said so."); *Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, & Stevens, P.A.,* 525 F.3d 1107, 1115 n.5 (11th Cir. 2008) (dismissing DPPA claim where DMV records were obtained "for prospective, not-yet-filed litigation"); *Senne*, 784 F.3d at 445 (information is "for use" in connection with anticipated litigation "whether or not" the information "would ever

be used."); *Graczyk v. W. Pub. Co.*, 660 F.3d 275, 279 (7th Cir. 2011) (theoretical use is sufficient – uses are not required to be "immediate" or certain); *Taylor*, 612 F.3d at 337 (use is permitted even where it is "likely" that much of the information obtained will never be actually used for such a purpose).

Thus, federal courts routinely hold that the use of DMV information is authorized under the DPPA where the information is obtained to collect debts or send notices, charges, or tickets in connection with driving or parking; such use is in anticipation of litigation. *See City of Tallahassee v. Federated Publ'ns, Inc.*, 2012 WL 5407280, at *1 (N.D. Fla. Aug. 9, 2012) (dismissing DPPA claim where DMV information was obtained to send notices to drivers who ran red lights because "[a] violation notice initiates a process that is informal but that is nonetheless an administrative proceeding bringing the disclosures within paragraph (4)[.]"); *Senne*, 784 F.3d at 445 (affirming DPPA dismissal where DMV information was used to send parking tickets); *Buxton v. Hartin Asset Mgmt., LLC*, 2023 WL 4861724, at *8 (W.D. Mich. July 31, 2023) (dismissing DPPA claim where information was used to collect on a debt).

Here as well, in having the Parking Violation Notice mailed to Plaintiffs and initiating an enforcement action, MPS and Premium acted in anticipation of potential litigation. Plaintiffs' arguments stating why Defendants' allegedly do not fit within § 2721(b)(4) all fundamentally misunderstand the section itself. "A court need not accept as true allegations in a complaint that contradict or are inconsistent with judicially-noticed facts." *Chapman v. Abbott Labs.*, 930 F. Supp. 2d 1321, 1323 (M.D. Fla. 2013).

Specifically, all of Plaintiffs' allegations concerning Defendants' allegedly not fitting within § 2721(b)(4) are predicated on Defendants' not actively engaging in the "fil[ing] [of] civil actions or arbitrations . . . ma[king] any case-specific decisions to file a lawsuit . . . [and not undertaking] case-specific legal evaluation." *See* ACC, ¶¶ 34, 75, 76, 77. Just because Defendants have not presently had the need to file civil actions related to parking collections, however, does not mean that they can't or won't. Clearly, a parking invoice noting a delinquent payment establishes a basis for collection via civil litigation. Just like a lawyer may collect personal information under the DPPA in preparation for a lawsuit that may, nevertheless, settle, Defendants collect this information pursuant to creating parking charges that are in clear anticipation of litigation that may nevertheless be resolved as long as the delinquent parker pays the outstanding amount. *See Thomas*, 525 F.3d at 1115 (dismissing DPPA claim where DMV records were obtained "for prospective, not-yet-filed litigation"); *Senne*, 784 F.3d at 445 (information is "for use" in connection with anticipated litigation "whether or not" the information "would ever be used.").

Even then, while Plaintiffs also allege that "[u]pon information and belief . . . Defendants have not made any case-specific decision to file a lawsuit, initiate arbitration, refer the matter to counsel, or pursue any legal proceeding against the registered owner[]", this allegation is directly false since MPS did file a counterclaim against a delinquent parker in a previous action. ACC at ¶ 76; *see Defendant's Answer to Complaint, Defenses, and Counterclaim Against Audrey Smiley*, Smiley et al. v. Municipal Parking Services, Inc., Case No. 3:24-cv-00320, Dkt. 8 (N.D. Fla., July 31, 2024).

Because Plaintiffs fail to make any allegation concerning Defendant's habits concerning litigation and how it pursues enforcement collection and thus the Court should not accept any future attempt by Plaintiff to otherwise color in allegations that they fail to make in their ACC. *See In re Mun. Parking Services, Inc. DPPA Litig.*, 2025 WL 1475794, at *8 (ruling that defendant failed to demonstrate it satisfied permissible use 4 of the DPPA only because plaintiff alleged that defendant 'never initiated any legal action against an alleged violator[.]'"). In fact, in that previous action, MPS did initiate legal action against the named plaintiff by filing a counterclaim to recover the amounts owed for unpaid parking. *In re Mun. Parking Services, Inc. DPPA Litig.*, Case No. 3:24-cv-00329, Dkt. 8, (N.D. Fla. July 31, 2024) (Defendant's Answer to Complaint, Defenses, and Counterclaim Against Audrey Smiley), attached as **Exhibit C**. Thus, Defendants' parking charges are sent in anticipation of litigation, falling squarely within permissible use 4.

## CONCLUSION

In Conclusion, plaintiffs Levine and Deppe lack standing to assert a DPPA claim against MPS and Premium. Even if Plaintiffs had standing, which they do not, Plaintiffs' claims fail as a matter of law. MPS and Premium's alleged use falls squarely within permissible use 4 enumerated in the DPPA.

For these reasons, MPS and Premium respectfully requests that Plaintiffs' Amended Class Action Complaint be dismissed in its entirety and that the Court reserve jurisdiction to assess any appropriate fees and costs.

## L.R. 3.01(g) CERTIFICATE OF CONFERRAL

In accordance with Rule 3.01(g) of the Local Rules of the Middle District of Florida, counsel for the parties conferred via electronic mail on June 18th, 2026. Undersigned counsel explained the grounds for seeking dismissal were similar to those asserted in the original motion and confirmed that the relief remains opposed.

Dated: June 18, 2026

Respectfully Submitted,

*/s/Kevin P. McCoy*

Kevin P. McCoy (Lead Trial Counsel)
Florida Bar No. 0036225
kmccoy@carltonfields.com
D. Matthew Allen
Florida Bar No. 866326
mallen@carltonfields.com
Carlton Fields, P.A.
4221 W Boy Scout Blvd., Suite 1000
Tampa FL 33607
Telephone.: (813) 229-4304

*Attorneys for Defendant Municipal Parking Services, Inc.*