**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

STEVE LEVINE and
JAQUELYN DEPPE,
Individually and on behalf
of all others similarly situated,

Plaintiffs,

v. Case No. 8:25-cv-2920-KKM-NHA

MUNICIPAL PARKING
SERVICES, INC., et al.,

Defendants.

___________________________________

# ORDER

Steve Levine and Jaquelyn Deppe sue Municipal Parking Services, Inc., Premium Parking Service, LLC, and GovCIO, LLC, in a putative class action for violations of the Driver's Privacy Protection Act (DPPA). *See* Am. Compl. (Doc. 32). Municipal Parking and Premium Parking jointly move to dismiss, arguing that the plaintiffs lack Article III standing and that, even if there were standing, the amended complaint still fails to state a claim. Parking MTD (Doc. 43) at 1–2. GovCIO also moves to dismiss, raising many of the same arguments. GovCIO MTD (Doc. 65). At issue is whether the defendants' invoicing for use of private parking lots caused concrete injuries to the plaintiffs and whether such actions fall within a permissible use under the statute.

## I. BACKGROUND

Municipal Parking and Premium Parking "operate[] private parking enforcement programs at parking facilities throughout Florida and other states." Am. Compl. ¶¶ 10, 11. GovCIO "provides or supports parking enforcement technology services for private parking operators, including Premium [Parking] and [Municipal Parking]." *Id.* ¶ 12. Specifically, the plaintiffs allege that GovCIO "requests, receives, processes, and stores personal information from motor-vehicle records, including registered-owner names and home addresses tied to captured license plate numbers" and then "transmits DMV-sourced personal information to [Municipal Parking] and Premium [Parking] and to mailing vendors to facilitate the generation and mailing of private parking notices." *Id.* ¶¶ 37–38.

Levine and Deppe both reside in Pinellas County, Florida. *See id.* ¶¶ 2–3. On April 26, 2025, Deppe twice drove through a private parking lot in Redington Shores, Florida, operated by Municipal Parking and Premium Parking. *See id.* ¶¶ 3, 48–50. She never parked in a parking space and merely used the lot to drop off and pick up family members. *See id.* Days later, she received a private parking invoice from Municipal Parking and Premium Parking that falsely claimed that "her vehicle had been parked for nearly four hours" and that "threatened booting or towing if payment was not received." *Id.* ¶ 3.

On October 7, 2025, Levine's daughter parked his vehicle in the same private parking lot in Redington Shores, Florida. *See id.* ¶¶ 2–3, 39–41. Levine later received a private parking invoice from Municipal Parking and Premium Parking that was mailed to his home. *Id.* ¶ 2. Levine had never dealt with either company before and the invoice "threatened that his vehicle could be booted or towed if payment was not received." *Id.*

Neither plaintiff gave any of the defendants their names, home addresses, or "signed a written consent, created an account, or provided personal information for private parking enforcement." *Id.* ¶ 4. Defendants identified them "by using their license plate numbers to obtain their names and/or home addresses from a state motor vehicle record." *Id.*

The plaintiffs allege that the defendants "did not retrieve Plaintiffs' personal information during the operation of a toll transportation facility or while Plaintiffs' vehicle was present at the parking facility." *Id.* ¶ 73. Rather, "the DMV lookup occurred only after the vehicles departed, as part of a post-departure invoicing process." *Id.* Nor did the defendants take these actions to obtain the information "for use in connection with any civil, criminal, administrative, or arbitral proceeding, or any investigation in anticipation of litigation." *Id.* ¶ 74. "The Parking Invoice did not threaten litigation." *Id.* "The Parking Invoice identified itself as an 'invoice,' " not as a pre-suit demand letter. *See id.* "In fact, the Parking Invoice expressly states that the 'INVOICE

. . . IS NOT SUBJECT TO CIVIL . . . PENALTIES.' " *Id.* The plaintiffs allege that the defendants "do not file civil actions or arbitrations to collect private parking charges of this type as part of this workflow[,]" which "is standardized and automated." *Id.* ¶ 75.

As a result of the defendants' conduct, the plaintiffs suffered "concrete and particularized harm" in the form of "privacy injur[ies]." *Id.* ¶¶ 85–86. The first is the retrieval and review by the defendants of Levine's and Deppe's names and home addresses "from a motor vehicle record without a permitted purpose." *See id.* ¶ 86. Levine alleges that he suffered a second "privacy injury" when the defendants used the "DMV-sourced personal information to send a private parking invoice to a home address Plaintiff Levine had never given them." *See id.* ¶ 89.

The plaintiffs also allege that they "spent time reviewing the mailed invoice, determining who Premium [Parking] and [Municipal Parking] were, attempting to understand how Premium [Parking] and [Municipal Parking] obtained their name and/or home address from a motor vehicle record, and evaluating the stated threats . . . in direct response to the privacy invasion." *Id.* ¶ 92.

In October 2025, Levine initiated this action against Municipal Parking. In May 2026, Levine amended the complaint, adding Deppe as a named plaintiff, and Premium Parking and GovCIO as defendants. The amended

complaint asserts three counts, one against each defendant for violations of the DPPA. *See id.* ¶¶ 115–146.

## II. LEGAL STANDARDS

A claim for relief must include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8. This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555). Nor do "naked assertion[s]" devoid of "further factual enhancement" suffice. *Twombly*, 550 U.S. at 557.

### A. Federal Rule of Civil Procedure 12(b)(1)

A defendant may move to dismiss a complaint for lack of standing. *See* FED. R. CIV. P. 12(b)(1). To establish standing, a plaintiff must show "(1) an injury in fact; (2) a causal connection between the injury and the alleged misconduct; and (3) a likelihood that the injury will be redressed by a favorable decision." *L.M.P. on behalf of E.P. v. Sch. Bd. of Broward Cnty.*, 879 F.3d 1274, 1281 (11th Cir. 2018) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). At the pleading stage, a plaintiff must clearly allege facts demonstrating each element for each claim. *Spokeo, Inc. v. Robins*, 578 U.S.

330, 338 (2016). Standing requirements apply no less in class actions, where "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Id.* at n.6 (citation modified).

### B. Federal Rule of Civil Procedure 12(b)(6)

"To survive a motion to dismiss" for failure to state a claim, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on its face when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court must accept the complaint's factual allegations as true and construe them in the light most favorable to the plaintiff. *See Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004), *abrogated on other grounds by Twombly*, 550 U.S. 544.

## III. ANALYSIS

### A. The Driver's Privacy Protection Act

The DPPA, 18 U.S.C. §§ 2721–2725, protects personal information

contained in motor-vehicle records. The DPPA makes it "unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b)." *Id.* § 2722. " '[M]otor vehicle record' means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." *Id.* § 2725(1). " '[P]erson' means an individual, organization or entity, but does not include a State or agency thereof." *Id.* § 2725(2). " '[P]ersonal information' means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." *Id.* § 2725(3).

The DPPA allows fourteen uses of "personal information." *See id.* § 2721(b). Only one is relevant here: "[f]or use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court." *Id.* § 2721(b)(4).

The DPPA provides a civil action for anyone whose "personal information" is "knowingly obtain[ed], disclose[d], or use[d]" by another. *See id.* § 2724(a). The plaintiff may recover "(1) actual damages, but not less than liquidated damages in the amount of $2,500; (2) punitive damages upon proof of willful or reckless disregard of the law; (3) reasonable attorneys' fees and other litigation costs reasonably incurred; and (4) such other preliminary and equitable relief as the court determines to be appropriate." *Id.* § 2724(b).

**B. Standing**

The defendants contend that the plaintiffs lack Article III standing. Each defendant argues that the plaintiffs fail to allege an injury-in-fact, and GovCIO also argues that any injury is not traceable to it. *See* Parking MTD at 6–7; GovCIO MTD at 6–21.

**a. Injury-in-Fact**

The plaintiffs rest their injury-in-fact on time they lost "reviewing the mailed invoice, determining who Premium [Parking] and [Municipal Parking] were, attempting to understand how Premium [Parking] and [Municipal Parking] obtained their name and/or home address from a motor vehicle record, and evaluating the stated threats." *See* Am. Compl. ¶ 92. The plaintiffs also advance two theories of intangible "privacy harms," both of which turn on their similarity to the common-law tort of intrusion by seclusion. First, the defendants invaded the plaintiffs' privacy by unlawfully obtaining the

plaintiffs' personal information from a motor-vehicle record. Second, the defendants invaded Levine's privacy by using his information from the motor-vehicle record to send the parking invoice to his home.

As the plaintiffs admit, whether the alleged lost time is a concrete harm depends on whether "the wasted time . . . responded to something that 'is itself a concrete harm.' " *Nelson v. Experian Info. Sols. Inc.*, 144 F.4th 1350, 1355 (11th Cir. 2025) (quoting *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc)); *see* Pls.' Resp. to Parking MTD (Parking Resp.) (Doc. 53) at 18–19. The plaintiffs allege that they lost time in "response to [intangible, but] concrete[,] privacy injuries." Parking Resp. at 19; *see* Am. Compl. ¶¶ 92–93. Thus, the concreteness of the alleged lost-time injury rises and falls with whether the intangible privacy harms are themselves concrete. Because I conclude that both intangible privacy harms are concrete, so too are the allegations of time lost responding to the privacy harms.

A "bare procedural violation, divorced from any concrete harm, [cannot] satisfy the injury-in-fact requirement of Article III." *Spokeo*, 578 U.S. at 341; *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 441–42 (2021). In other words, "a plaintiff does not 'automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.' " *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 997 (11th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 341).

"[S]tatutory violations do not—cannot—give [courts] permission to offer plaintiffs a wink and a nod on concreteness [of injury]. Plaintiffs must show, and the courts must ensure, that an alleged injury is concrete, or else [they] have no jurisdiction to consider it." *Muransky*, 979 F.3d at 925.

When, like here, "an alleged harm is intangible," "a plaintiff can also have a real stake—and therefore a real injury." *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1243 (11th Cir. 2022) (en banc). "Congress is 'well positioned to identify' those intangible harms, and when that body speaks by passing a statute that includes a cause of action for a particular harm, we find its judgment 'instructive and important.' " *Id.* (quoting *Spokeo*, 578 U.S. at 341). Indeed, "Congress may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.' " *Spokeo*, 578 U.S. at 341 (quoting *Lujan*, 504 U.S. at 578). But "[Congress] may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 594 U.S. at 426 (quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)).

Thus, to determine if a statutory violation alone causes a concrete intangible harm, one should "compar[e] new causes of action to old ones." *Hunstein*, 48 F.4th at 1243. Specifically, "[w]e ask 'whether an alleged intangible harm has a close relationship to a harm that has traditionally been

regarded as providing a basis for a lawsuit in English or American courts.' " *Id.* (quoting *Spokeo*, 578 U.S. at 341). "That kind of statutory violation, the Supreme Court has instructed, generally causes harm concrete enough to support standing." *Id.* (citing *TransUnion*, 594 U.S. at 424–25). If the pleading of the statutory violation "completely fails to allege an element *essential to the harm* set out as a common-law comparator," then there is not a sufficiently close relationship to a traditional cause of action. *See id.* at 1249 (emphasis added); *see also TransUnion*, 594 U.S. 434 n.6 (indicating that a theory of harm that "circumvents a fundamental requirement" of an analogous common-law tort "does not bear a sufficiently 'close relationship' " to establish standing).

Courts should "not require carbon copies; the new harm need only be 'similar to' the old harm." *Drazen v. Pinto*, 74 F.4th 1336, 1343 (11th Cir. 2023) (en banc) (citing *Hunstein*, 48 F.4th at 1249). This inquiry focuses on "whether the harms are similar in kind but not degree." *Id.* at 1344. When courts instead consider the degree of harm, they engage in line-drawing, which is improper because "the Constitution empowers Congress to decide what degree of harm is enough so long as that harm is similar in kind to a traditional harm." *See id.* at 1345. Indeed, "Congress [can] use[] its lawmaking powers to recognize a lower quantum of injury necessary to bring a claim under" a statutory cause of action instead of its common-law comparator. *Id.* That said, under Eleventh Circuit's precedent, for some torts, an element "either exists or it does not;

there is no in-between." *See id.* at 1345 (citing *Hunstein*, 48 F.4th at 1249 and explaining that, for the tort of public disclosure of private information, the element of publicity is either present or not).

As an initial matter, multiple district court cases cited by the defendants dismissed similar allegations for lack of standing, in part, because the theories of harm were not closely related to intrusion upon seclusion as developed by Florida state courts, which requires intrusion into a place. *See* Parking MTD at 9–10 (citing *Jeanmary v. Pro. Parking Mgmt. Corp.*, No. 24-61213-civ-AHS (S.D. Fla. Feb. 5, 2026) (Doc. 61); *Cicale v. Pro. Parking Mgmt. Corp.*, 832 F. Supp. 3d 1331 (S.D. Fla. 2026); GovCIO MTD at 19–20 (citing *Cicale*, 832 F. Supp. 3d 1331; *Bourdeau v. Pro. Parking Mgmt. Corp.*, No. 25-60390-civ-AHS (S.D. Fla. Feb. 19, 2026) (Doc. 31)); *see also Spilfogel v. Fox Broad. Co.*, 433 F. App'x 724, 726–27 (11th Cir. 2011) (per curiam) (explaining the narrower nature of Florida's version of intrusion upon seclusion, including the requirement that the intrusion be into a "place"). The proper inquiry focuses not on the particularities of the forum state's tort law, but rather on the common law as developed "in English or American courts." *See Drazen*, 74 F.4th at 1343. Thus, the defendants' arguments are unpersuasive to the extent that they depend upon unique treatment of intrusion upon seclusion in Florida courts, or federal caselaw considering that tort. *See* Parking MTD at 9–10, 12 (arguing that motor-vehicle records are not a *place* in which there is a

reasonable expectation of privacy (emphasis added)); Parking Reply at 4 (similar); GovCIO MTD at 19–20 (similar).

1. *The "unlawfully obtaining" privacy harm theory.*

Municipal Parking and Premium Parking both argue that the plaintiffs "do not sufficiently analogize the violation of their [DPPA] rights" to a "common law cause of action." Parking MTD at 12. GovCIO seeks to recast the "unlawfully obtaining" theory as merely a loss of control over personal information. *See* GovCIO MTD at 16. Although the plaintiffs include an allegation regarding the loss of control, *see* Am. Compl. ¶ 88, the first injury theory is clearly identified as the improper access to the personal information contained in the motor-vehicle record, *see id.* ¶¶ 86–87; Parking Resp. at 8–15. Despite the different framing, GovCIO makes similar arguments and relies on many of the same cases as the other defendants. *Compare* GovCIO MTD at 15–19, *with* Parking MTD at 6–13.

The plaintiffs respond that unlawfully obtaining their "personal information from protected motor-vehicle records is itself the kind of unauthorized examination of private records that intrusion upon seclusion has long treated as actionable." *See* Parking Resp. at 3; GovCIO Resp. at 8–14. "Intrusion upon seclusion consists of an (i) intentional intrusion (ii) into another's solitude or seclusion, (iii) which would be highly offensive to a reasonable person." *Drazen*, 74 F.4th at 1345 (citing Restatement (Second) of

Torts § 652B (1977)). The plaintiffs argue that intrusion upon seclusion under the common law redressed invasions of privacy that occurred during "some other form of investigation or examination into [a plaintiff's] private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents." Restatement (Second) of Torts § 652B cmt. b (1977); *see* Parking Resp. at 9; Pls.' Resp. to GovCIO MTD (GovCIO Resp.) (Doc. 69) at 10. "The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the . . . information outlined." Restatement (Second) of Torts § 652B cmt. b (1977). In short, the tort was concerned, in part, with the harm that occurs when another intentionally reviews, without permission, one's private files or information.

The defendants appear to agree that violating the DPPA by improperly obtaining someone's information is sufficiently analogous to an intrusion that would be highly offensive to a reasonable person. Instead, they focus their arguments on the purported lack of commonality with the second element: that the intrusion be into another's solitude or seclusion. *See* Parking MTD at 12–13; GovCIO MTD at 18–20. The defendants point to a series of cases holding that there is no expectation of privacy in motor-vehicle records. *See* Parking MTD at 12–13; GovCIO MTD at 18–20. Only one such case, *Corbitt v. Sec'y of*

*the Ala. Law Enf't Agency,* is a published Eleventh Circuit opinion, and it is readily distinguishable. *See* 115 F.4th 1335, 1350–52 (11th Cir. 2024). *Corbitt* held, in the context of a challenge to the sex displayed on certain individuals' driver's licenses, that there was no *constitutional* privacy interest in the information displayed on their driver's licenses. *See id.* But that does not foreclose a DPPA action. *See Collier v. Dickinson*, 477 F.3d 1306, 1309–12 (11th Cir. 2007) (affirming dismissal of a Section 1983 constitutional claim relating to disclosure of personal information contained in motor-vehicle records while reversing dismissal of a parallel claim premised on the DPPA's statutory rights).

One case cited by the defendants recognized that statutory DPPA claims can survive when constitutional claims would fail. *See In re Mun. Parking Servs., Inc. DPPA Litig.*, No. 3:24CV320-TKW-HTC, 2025 WL 1475794, at *4 (N.D. Fla. Feb. 12, 2025). Nonetheless, that court concluded that there was no "reasonable expectation of privacy at common law" in "DMV records," thus the statutory violation of the DPPA under those circumstances (similar in all material aspects to those here) was "missing" the essential second element of intrusion upon seclusion. *See id.* at *1, 4. I disagree.

To determine, in this context, that the second element—intrusion into sufficiently private affairs or concerns—is missing engages in line-drawing properly left for Congress. The Eleventh Circuit's recent opinion in *Drazen* is

instructive. *Drazen* emphasized that the inquiry is not into the *degree* to which a statutory pleading resembles the common-law comparator's elements but rather is whether it "resembles the *kind* of harm associated with intrusion upon seclusion." *See* 74 F.4th at 1344. Comparing intrusion upon seclusion to a Telephone Consumer Protection Act (TCPA) claim seeking to recover for receipt of unwanted text messages, *Drazen* held that a single unwanted text message causes a concrete injury. *Id.* at 1345. *Drazen* acknowledged that a single text message was not sufficiently offensive for a plaintiff to bring an intrusion upon seclusion claim but held that "an unwanted text message is nonetheless offensive to some degree to a reasonable person." *Id.* Thus, the harm was similar in kind to intrusion upon seclusion. *Id.* To decide the number of text messages that would be sufficiently offensive would infringe on Congress's "lawmaking powers to recognize a lower quantum of injury necessary to bring a claim." *See id.*

Through the DPPA, Congress has determined that the repository of personal information that states collect from drivers is sufficiently sensitive that it should be protected.[1] Although there was "no liability for the

---

[1] The power of Congress to increase privacy protections or to, in effect, create an expectation of privacy over certain information is well-settled. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019) (acknowledging, in the TCPA context, that "the Constitution in no way bars" Congress from creating a statutory scheme to "protect[] personal privacy"); *Johnson v. Sawyer*, 120 F.3d 1307, 1323 (5th Cir. 1997) (describing 26 U.S.C. § 6103 as Congress "determining that a taxpayer has

examination of a public record concerning the plaintiff" under common law, Restatement (Second) of Torts § 652B cmt. c (1977), motor-vehicle records are not public records in the same sense because they may be obtained, disclosed, or used only under certain enumerated conditions. *See* 18 U.S.C. §§ 2721(a)–(c), 2722(a), 2724(a). Improperly accessing motor-vehicle records, as both plaintiffs allege the defendants did, *see* Am. Compl. ¶¶ 86–87, thus causes a harm similar in kind to one of the harms that intrusion upon seclusion traditionally remedied—the invasion of privacy that occurs when one reviews another's private files or information without permission—even if such access would likely be insufficient for an intrusion upon seclusion claim itself. Further, such improper access is "offensive to some degree to a reasonable person." *See Drazen*, 74 F.4th at 1345. Thus, the plaintiffs' first theory of harm "shares a close relationship with the harm underlying the tort of intrusion upon seclusion." *See id.*; *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 922 (4th Cir. 2022) (holding that impermissibly obtaining a plaintiff's information from a motor-vehicle record is, itself, a "legally cognizable privacy injury"); *cf. Heglund v. Aitkin County*, 871 F.3d 572, 577 (8th Cir. 2017) (holding that allegations of improper access of DPPA-protected information alone was sufficient for a concrete harm because "[a]n individual's control of information

---

a statutorily created 'privacy' interest in *all* his tax return information, despite the fact that some of it is not entirely 'secret' "). The DPPA is no different.

concerning her person . . . was a cognizable interest at common law"); *Kehoe v. Fid. Fed. Bank & Tr.*, 421 F.3d 1209, 1216 (11th Cir. 2005) (holding that plaintiffs did not need to "prove actual damages to recover [the DPPA's] liquidated damages" and reversing the summary judgment entered in favor of the defendant based on the plaintiff's failure to assert any actual damages).

Although not in the DPPA context, courts have repeatedly reached this conclusion in related contexts where defendants reviewed plaintiffs' records. *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361, 368–69 (4th Cir. 2026) (en banc) (holding that improperly disclosing "personally identifiable information" held in government files inflicts a harm similar in kind to intrusion upon seclusion); *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1192–93 (7th Cir. 2021) (holding that the impermissible review of a consumer's credit report information constituted a concrete injury analogous to the harms from intrusion upon seclusion); *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 491 (9th Cir. 2019) (same).

The defendants rely on cases that dismissed similar claims, but those cases lack a consistent animating principle and do not persuade. Some, as discussed above, considered Florida's unique intrusion upon seclusion tort. *See* Parking MTD at 9–10, 12; GovCIO MTD at 19–20; *Cicale*, 832 F. Supp. 3d at 1333–36; *Bourdeau*, No. 25-60390-civ-AHS (Doc. 31). Another did not confront the question of whether improperly obtaining information from motor-vehicle

records constituted an intangible, but concrete, injury. *See* GovCIO MTD at 19; *Schmalshof v. McDonough County*, No. 3:24-cv-03071-SLD, 2025 WL 714359, at *4 (C.D. Ill. Mar. 5, 2025). Lastly, one improperly considered the degree of harm, rather than the kind of harm, when comparing the pleaded DPPA violation to intrusion upon seclusion. *See* Parking MTD at 14; GovCIO MTD at 19; *Stegmeyer v. ABM Indus. Inc.*, No. 24-cv-00394, 2026 WL 879588, at *5 (N.D. Ill. Mar. 30, 2026). None convince me.

*2. The intrusive-invoice privacy-harm theory.*

As to the second theory, the defendants argue that it is "well settled that receiving an invoice in the mail is not an 'intrusion upon one's seclusion.' " GovCIO MTD at 19; Parking MTD at 14. As with the first theory, *Drazen* compels the conclusion that this theory alleges a concrete albeit intangible injury. *Drazen*, 74 F.4th at 1345. A plaintiff suffers an injury with a close relationship with the harm underlying the tort of intrusion upon seclusion when they receive at home an unwanted invoice sent with information obtained from a motor-vehicle record.

To be sure, district courts within the Eleventh Circuit are split on whether receiving an unwanted communication in the mail constitutes a harm of the same kind as that of the unwanted text message in *Drazen*. *Contrast Cicale*, 832 F.Supp.3d at 1336 (disregarding this theory of harm because "there is no expectation of privacy to not receive a bill at your home"), *Walden-Curry*

*v. Medicredit Inc.*, No. 25-CV-60919, 2026 WL 778089, at *8 & n.6 (S.D. Fla. Jan. 23, 2026) (concluding that such a letter is a different kind of harm), *report and recommendation adopted*, No. 25-60919-civ, 2026 WL 778086 (S.D. Fla. Mar. 6, 2026), *Valiente v. Palm Beach Credit Adjustors, Inc.*, 817 F. Supp. 3d 1307, 1318 (S.D. Fla. 2025) (describing letters delivered to a mailbox as "an altogether different type of injury" from text messages and telephone calls), *and Heres v. Medicredit, Inc.*, No. 23-cv-24815, 2024 WL 3291738, at *12 (S.D. Fla. July 3, 2024) (explaining that a letter is not like the "undesired buzzing" caused by a text message (citation omitted)), *with Alonso v. Waldrop & Assocs., P.C.*, No. 7:25-cv-484-EGL, 2026 WL 523405, at *4–6 (N.D. Ala. Feb. 25, 2026) (concluding, in the light of *Drazen*, that an unwanted communication, including by letter, resembles the kind of harm associated with intrusion upon seclusion), *and Hallford v. Portfolio Recovery Assocs., LLC*, No. 2:23-cv-1497-ACA, 2024 WL 6901341, at *2–3 (N.D. Ala. Feb. 21, 2024) (same).[2] I find *Alonso* and *Hallford* more persuasive.

There is no meaningful distinction between the kind of harm caused by an unwanted text message and an unwanted invoice in the mail. Both irritate the recipient and interrupt the peace and seclusion of their private affairs one

[2] Although most of these cases arise under the Federal Debt Collection Practices Act, they consider a factual scenario similar to the present case and squarely address the relevant legal question of whether an unwanted mailing constitutes a harm similar in kind to one associated with intrusion upon seclusion.

might otherwise enjoy. Courts that conclude that the harm is different in kind often focus on the fact that text messages are received by a cell phone that is "typically kept on one's person[,] and are accompanied by a ringing or buzzing that demands the recipient's attention[,]" while letters or invoices "often arrive[] silently, outside the home, and [are] collected and reviewed at the recipient's convenience." *Walden-Curry*, 2026 WL 778089, at *7; *see Pucillo v. Nat'l Credit Sys., Inc.*, 66 F.4th 634, 641 (7th Cir. 2023); *Heres*, 2024 WL 3291738, at *11–12 (highlighting the accompanying "buzz"). This argument goes to the degree of harm more than the kind. Emphasizing the accompanying buzzing or proximity to one's person speaks to the level of annoyance or the method of the harm, not the kind of harm. Undoubtedly, the vibration in one's pocket caused by an unwanted text message does intrude and irritate—as does discovering in one's mailbox an unwanted invoice demanding payment and threatening to tow one's vehicle. Both cause an irritating intrusion. *See Pucillo*, 66 F.4th at 641 (admitting that "receiving a letter can be an irritation"); *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630, 634–35 (9th Cir. 2023), *cert. denied*, 146 S. Ct. 120, 223 L. Ed. 2d 25 (2025) (rejecting *Pucillo*'s distinction between text messages and letters and holding that receipt of an unwanted letter inflicts the same kind of harm that intrusion upon seclusion targets).

As *Alonso* identifies, "there are practical reasons to question" the distinctions between text messages and mail raised by the courts that have

found the harms to be different in kind. *See* 2026 WL 523405, at *5. Indeed, " 'it is a rather simple matter to silence, block, delete, or flat out ignore unwanted text messages' and 'is arguably more arduous to go to one's mailbox, open, read, and then discard postal mail.' " *Id.* (quoting *Pucillo*, 66 F.4th at 645 (Lee, J., dissenting)). Further, "unlike text messages, '[f]or many purposes, . . . the government is entitled to assume that citizens will read mail sent to them and be aware of its contents.' " *Id.* (quoting *United States v. Phillips*, 600 F.2d 535, 540 (5th Cir. 1979)); *see also id.* (listing additional examples of legal rights turning on the obligation to read one's mail).

Municipal Parking and Premium Parking argue that, according to the Restatement (Second) of Torts, "[u]nsolicited mailings do not constitute an actionable intrusion." Parking Reply at 6 (quoting Restatement (Second) of Torts § 652B rep.'s n. to cmt. d (1977)); *see Heres*, 2024 WL 3291738, at *11 (making the same point). Upon closer examination, this, too, fails to persuade. The reporter's note cites two cases for this proposition. The first, *Stilson v. Reader's Digest Association, Inc.*, did not consider an intrusion upon seclusion claim at all. *See* 28 Cal. App. 3d 270, 273 (Cal. Ct. App. 1972). Rather, it involved a claim for unauthorized commercial use of names, more akin to a misappropriation of name, image, or likeness claim. *See id.* The second, *Bradshaw v. Michigan National Bank*, held that "the unsolicited mailing of a credit card is not an invasion of privacy." 197 N.W.2d 531, 532 (Mich. Ct. App.

1972). But *Bradshaw* seemingly acknowledged that an unsolicited mailing is an intrusion, just not one that was offensive enough to be actionable. *See id.* ("However, this intrusion must be by some means that a reasonable man would find objectionable."). Indeed, *Bradshaw* left open that the mailing of certain "obnoxious materials" could be an actionable intrusion. *See id.* The reporter's note overextends and is unpersuasive because the proper inquiry considers the "types of harms protected at common law, not the precise point at which those harms become actionable." *Drazen*, 74 F.4th at 1344 (quoting *Krakauer*, 925 F.3d at 564). And, as *Alonso* noted, "courts have considered the sending of letters as evidence of intrusions upon privacy and seclusion." 2026 WL 523405, at *5 (collecting cases).

The second theory of harm, which applies only to Levine, *see* Am. Compl. ¶ 89, is similar in kind to one of the harms that intrusion upon seclusion traditionally remedied. Thus, it is concrete, and Levine has sufficiently alleged a second injury-in-fact.

**b. Traceability**

"Article III standing requires a 'causal connection between the injury and the conduct complained of' -- in other words, the injury must be 'fairly traceable to the challenged action of the defendant.' " *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019) (quoting *Lujan*, 504 U.S. at 560). "Fair traceability does not require a showing of proximate cause and may be met

even where the plaintiff's injury was 'indirectly caused' by the defendant's conduct." *Russo v. Sec'y, Dep't of Comm.*, 189 F.4th 1264, 1274 (11th Cir. 2026) (citations omitted). Nonetheless, the plaintiff must "demonstrate factual causation between his injuries and the defendant's misconduct." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023) (citation modified).

A plaintiff cannot show that his injury is fairly traceable to the challenged conduct of the defendant when the injury is self-inflicted or caused by the independent action of a third party that is not before the court. *See Cordoba*, 942 F.3d at 1271; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013); *Swann v. Sec'y, Georgia*, 668 F.3d 1285, 1288–89 (11th Cir. 2012). Thus, if a plaintiff would have suffered " 'precisely the same' harm" if the defendant had not engaged in the alleged misconduct, there is no standing. *See Walters*, 60 F.4th at 651 (quoting *Cordoba*, 942 F.3d at 1272).

Although GovCIO contends that none of the plaintiffs' injuries are, as alleged, traceable to it, GovCIO's arguments appear to address only the second privacy harm caused by the unwanted invoice. *See* GovCIO MTD at 6–10; GovCIO Resp. at 16. And, to be sure, the plaintiffs' first privacy injury—the unlawful obtaining of their information from motor-vehicle records—is traceable to GovCIO's actions, because, as alleged, GovCIO is the entity responsible for "DMV data-retrieval . . ., registered-owner look up services, data infrastructure, and related systems." Am. Compl. ¶¶ 36–38, 139–40

(alleging that GovCIO obtained the information from the motor-vehicle records directly).

Whether the harm from the unwanted invoice is traceable to GovCIO is a closer question. GovCIO contends that its alleged activities, which are generally limited to looking up and retrieving information from motor-vehicle records, are too attenuated from the mailing of the invoices for traceability. *See* GovCIO MTD at 8–10; Am. Compl. ¶¶ 36–38, 139–40. GovCIO notes that the complaint alleges that only Municipal Parking and Premium Parking are *directly* involved in mailing the invoices. *See* GovCIO MTD at 7 (citing Am. Compl. ¶¶ 14–15, 43–47, 53–57). Conversely, the complaint alleges that GovCIO provided the plaintiffs' information, which it obtained from motor-vehicle records, to Municipal Parking and Premium Parking so that they could generate and mail the invoices. *See* Am. Compl. ¶ 38. Plaintiffs' injury from the unwanted invoice is traceable to GovCIO because, without GovCIO's conduct, Municipal Parking and Premium Parking would not have the requisite information to send the invoice.

### C. Failure to State a Claim for Relief

The defendants argue that, even if the plaintiffs do have standing, their claims still fail to state a claim because the defendants obtained, disclosed, or used the plaintiffs' information in a permissible manner. *See* Parking MTD at 16–19; GovCIO MTD at 22–25. Section 2721(b)(4) permits the disclosure and

use of information contained in motor-vehicle records "in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court." The defendants aver that their activities involved "investigation in anticipation of litigation," and, thus, fall within permissible use. *See* Parking MTD at 16; GovCIO MTD at 22.

In 2013, the Supreme Court considered—and narrowly construed—this exception. *See Maracich v. Spears*, 570 U.S. 48, 60 (2013). Indeed, the defendants' near complete reliance on pre-*Maracich* case law is telling. *See* Parking MTD at 16–19; GovCIO MTD at 22–25. " '[I]nvestigation in anticipation of litigation' is best understood to allow background research to determine whether there is a supportable theory for a complaint, a theory sufficient to avoid sanctions for filing a frivolous lawsuit, or to locate witnesses for deposition or trial testimony." *Maracich*, 570 U.S. at 63–64. *Maracich* instructs that the "proper inquiry" is into the defendant's "predominant purpose." *See id.* at 71–72. The predominant purpose can be ascertained from "the communication itself" and "the defendant's whole course of conduct." *Id.* at 72.

The communication and alleged course of conduct show that the predominant purpose is not investigation in anticipation of litigation. The invoice the plaintiffs received identifies "itself as an 'invoice,'" does "not threaten litigation," and "expressly states that the 'invoice . . . is not subject to civil . . . penalties." Am. Compl. ¶ 74 (citation modified). The plaintiffs allege that the defendants "do not file civil actions or arbitrations to collect private parking charges," and have the purpose of "identify[ing] the registered owner, locat[ing] the owner's home address, generat[ing] a private parking invoice, and seek[ing] payment through their notice-based enforcement workflow." *Id.* ¶¶ 75–76. In short, "Defendants use DMV-sourced personal information to generate and send private parking invoices at scale." *Id.* ¶ 78. The "workflow is built around sending automated invoices" and "using payment deadlines and threatened non-litigation consequences to prompt payment." *Id.*

The defendants argue that, nevertheless, their activities should be considered investigation in anticipation of litigation because they *could* sue over unpaid parking charges if they chose. *See* Parking MTD at 18; GovCIO MTD at 24. But *Maracich* requires the identification of the *predominant* purpose, not merely any possible purpose. GovCIO's arguments that the activity is related to identifying the necessary parties (i.e., the drivers, or would-be defendants) to "any potential collection action" and that "every lookup [need not] lead[] to litigation" are unavailing. *See* GovCIO MTD at 23–

24. First, at this stage, I am bound to accept as true the allegations in the complaint, which include the allegation that the defendants "do not file civil actions or arbitrations to collect private parking charges." *See* Am. Compl. ¶ 75. Second, the defendants' arguments are belied by the "invoice" itself. Had the defendants sent out a demand letter from an attorney threatening litigation rather than an invoice or requested judicial notice of a series of collection actions that they initiated, then the outcome might be different.[3] But they did not. Thus, the plaintiffs state a claim for violations of the DPPA.

## IV. CONCLUSION

Because of their privacy injury, plaintiffs have standing to pursue their claim against all three defendants. And, plaintiffs have stated a claim upon which relief can be granted. Therefore, I **DENY** defendants' motions to dismiss. (Docs. 43, 65)

Accordingly, the following is **ORDERED**:

1. Municipal Parking Services, Inc., and Premium Parking Service, LLC's Joint Motion to Dismiss (Doc. 43) is **DENIED**.
2. GovCIO, LLC's Motion to Dismiss (Doc. 65) is **DENIED**.

---

[3] The identification by Municipal Parking and Premium Parking of a single *counterclaim* filed in a separate action, if anything, supports the plaintiffs' allegations as to the defendants' predominant purpose. *See* Parking MTD at 18–19.

3. No later than **November 19, 2026**, the defendants must answer the amended complaint (Doc. 32).

**ORDERED** in Tampa, Florida, on November 5, 2026.

Kathryn Kimball Mizelle
United States District Judge